```
                                    ┌─────────────────────────────┐
                                    │ USDC SDNY                   │
UNITED STATES DISTRICT COURT        │ DOCUMENT                    │
SOUTHERN DISTRICT OF NEW YORK       │ ELECTRONICALLY FILED        │
- - - - - - - - - - - - - - - - - - x DOC #: _____        │
                                    │ DATE FILED: 3-19-13         │
                                    └─────────────────────────────┘
```

THE NIELSEN COMPANY (US), LLC,

                 Plaintiff,       :

                             :     11 CV 2939

         v.                  :     (LAP)(FM)

                             :     **Memorandum and Order**

SUCCESS SYSTEMS, INC.,          :

                             :

              Defendant.     :

- - - - - - - - - - - - - - - - - - x

**LORETTA A. PRESKA**
**CHIEF UNITED STATES DISTRICT JUDGE**

On March 26, 2012, following a March 19, 2012 order from Magistrate Judge Frank Maas, which granted the parties leave to amend their pleadings, Plaintiff Nielsen Company (US), LLC ("Plaintiff") filed an Amended Complaint in the instant action. In addition to adding an additional cause of action against Defendant Success Systems, Inc. ("Success"), the Amended Complaint also names as additional defendants Scott Tarlow ("Tarlow") and Mindy Novick ("Novick").

On April 13, 2012, Success, Tarlow, and Novick (collectively "Defendants") filed a joint motion to dismiss portions of the Amended Complaint. Specifically, Defendants argued that: (1) the sole cause of action against Novick should be dismissed for failure to state a claim; (2) the newly added cause of action against Success should be dismissed for failure

1

to plead the breach of any contractual provision; and (3) the third cause of action should be dismissed as to Tarlow and Success as such a claim is barred by the contractual merger clause between the parties or, in the alternative, is not plead with the requisite specificity.

On April 13, 2012, the Defendants filed an Answer to the Amended Complaint as well as counterclaims against Plaintiff. The Defendants' counterclaims assert fourteen causes of action against Plaintiff.

On April 20, 2012, Plaintiff moved to dismiss one of Defendants' fourteen counterclaims on the grounds that Defendants' allegations, even if true, fail to establish an aiding and abetting breach of fiduciary duty claim.

The parties' motions before the Court have been fully briefed, and having reviewed these submissions, the Court now **GRANTS in part and DENIES in part** Defendants' motion to dismiss [dkt. no. 55] and **DENIES** the Plaintiff's motion to dismiss count thirteen of Defendants' counterclaims [dkt. no. 60].

I.    BACKGROUND

For the purpose of deciding the parties' cross-motions to dismiss, the Court takes as true the facts alleged in the pleadings and draws all reasonable inferences in favor of the non-movant. See Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008).

2

### A. The Parties

Plaintiff is a Delaware limited liability company with its principal office located in New York City. (Am. Compl. ¶ 1.) Plaintiff is in the business of providing a broad range of consumer packaged goods ("CPG") analytics, market data and consulting services. Id. ¶ 8. As part of its CPG service offerings, Plaintiff collects sales and inventory data which it then analyzes to produce market research reports that are licensed to retail clients. Id. ¶ 8. These analytical reports are created, in part, with data that is collected electronically and/or manually through consumer panels and retail stores. Id. ¶ 9.

Success is a Connecticut corporation with its principal offices located in Stamford, Connecticut. Id. ¶3. Success is in the business of supplying software and web-based applications to improve the business operations of retail stores. Id. ¶ 10.

At all times relevant to the Amended Complaint, Tarlow was the President and Chief Executive Officer of Success, and Novick was Success' Chief Financial Officer and majority shareholder.[1] Id. ¶¶ 3-4.

---

[1] Tarlow and Novick were also, at all times relevant to the Amended Complaint, married to one another. (Am. Compl. ¶ 5.)

## B. The Cooperation Agreement ("CA")

On or about May 29, 2009, Plaintiff entered into a
Cooperation Agreement ("CA") with Success.  Id. ¶ 12.  Plaintiff
enters such agreements with vendors in furtherance of its
collection and aggregation of sales and market data.  Id. ¶ 11.
Pursuant to the CA between Success and Plaintiff, Success agreed
to provide Plaintiff with signed agreements from retailers
whereby such stores agreed to allow their sales and inventory
data to be transmitted to Plaintiff. Id. ¶ 13.  Additionally,
Success also agreed to "collect and deliver to [Plaintiff] the
scanning data, in the format described" in an appendix attached
to the CA.  Id. ¶ 12.  Under the terms of the CA, for each
retailer that provided data to Plaintiff as agreed upon by the
parties, Success was entitled to an annual payment of $1,500
($375 paid quarterly) and a one-time setup fee of $500.  Id. ¶
13.  Plaintiff ultimately terminated the CA, but prior to this
termination, Success transmitted data from no more than
approximately thirty stores to Plaintiff  Id. ¶ 14.

## C. The Automation Project

In or around mid-2010, Plaintiff embarked on a project
aimed at automating the reports it received from its base of
small chain and independent convenience stores (the "Automation
Project").  Id. ¶ 17.  This base of stores was composed of
1,200-1,300 small chain and independent convenience stores that

4

were each under an exclusive agreement to provide manually
reported market, inventory and/or sales data to Plaintiff.  Id.
¶ 15-17.

### 1. *The RFP and Proposal*

In conjunction with the Automation Project, on August 6,
2010, Plaintiff released a request for proposals (the "RFP").
Id. ¶ 18.  Through the RFP, Plaintiff solicited bids from
vendors who would act as Plaintiff's agent in: (1) recruiting
stores to convert to automated reporting; (2) installing the
required hardware and software on site; (3) training stores; and
(4) collecting data.  Id.

On August 13, 2010, Success submitted a proposal in
response to the RFP (the "Proposal"), in which it offered to
serve as Plaintiff's vendor and agent in carrying out the
Automation Project.  Id. ¶ 22.  Upon information and belief, the
Proposal was created primarily by Tarlow with input by Novick.
Id. ¶ 23.

In its Proposal, Success represented that it had two fully
functional software applications, ePB and SilentCollector,
(together the "Software Applications") ready for immediate use
in carrying out the Automation Project, id. ¶ 30, but these
statements did not accurately describe the state of the Software
Applications.  Id. ¶ 55-60.  Contrary to the statements made in
the Proposal, the Software Applications were in fact not fully

developed or functional for use in the Automation Project.  Id.
¶¶ 29, 35, and 56.

As a result of the misrepresentations made in the Proposal,
however, Plaintiff selected Success as the vendor for the
Automation Project.  Id. ¶ 32.

### 2. The General Services Agreement ("GSA")

Following Plaintiff's selection of Success as the vendor
for the Automation Project, Success and Plaintiff negotiated a
General Services Agreement (the "GSA").  Id. ¶ 33.

During negotiations, Success represented that it had
hundreds of existing stores within its network that met
Plaintiff's specifications and that these stores could be added
to Plaintiff's existing base of reporting stores.  Id. ¶ 35.
Additionally, through Tarlow, Success again misrepresented, as
it had in the Proposal, that the Software Applications were
fully developed and ready for immediate use.  Id. ¶ 35.

On or about October 1, 2010, Plaintiff and Success executed
the GSA, which included a Statement of Work ("SOW") attached as
Exhibit A.  Id. ¶ 37.

Pursuant to the terms of the GSA and SOW, Success was to:
(1) convert to automated platforms Plaintiff's existing base of
1,222 manually-reporting stores, or instead, stores from a list
of previously agreed upon "replacement" stores; (2) provide
ongoing electronic sales and inventory data, including weekly

electronic data, to Plaintiff for Plaintiff's exclusive use; (3) comply with all timing and schedule requirements, including a January 3, 2011 deadline for providing data from all 1,222 converted stores; (4) train and support stores; (5) validate data feed quality; (6) maintain sufficient staffing; (7) provide a transparent reporting system; (8) use its best efforts to complete the services in the most professional, efficient, economical, and expeditious manner consistent with the best interests of Plaintiff; and (9) provide reasonable assurance of full and timely performance of its obligations. Id. ¶¶ 37-54.

On its part, Plaintiff agreed in the GSA to pay Success: (1) a $1,200 fee for each successful store conversion; (2) a $3,000 fee for each successful store conversion of a new store; and (3) a $999,000 advance payment for the first 333 new store conversions. Id. ¶¶ 9 and 44.

### D. Performance Under the CA and GSA

On or about October 9, 2010, Plaintiff made the $999,000 advance payment specified in the GSA. Id. ¶ 61. Almost immediately upon receipt of these funds, however, Success, through Tarlow, began claiming that it would be unable to meet the deadlines set forth in the GSA. Id. ¶ 62.

### 1. Conversions of Plaintiff's Existing Base

In October 2010, Plaintiff communicated to Success that it should prioritize the conversion of the 1,222 existing base of

stores rather than efforts to sign up new stores. Id. ¶ 63.
Success responded to Plaintiff that the requested modification
of its efforts would extend the deadlines for the Automation
Project. Id. Although Plaintiff's request was consistent with
and not a material change to the scope of the work provided for
by the GSA, at Success' behest, Plaintiff provided a significant
advance payment to Success to be utilized as a credit going
forward and allowed Success additional time to perform. Id. ¶
65.

On December 7, 2010, Success represented that hundreds of
conversions were imminent as it had hundreds of executed
agreements in its possession in which store owners agreed in
writing to the provision of sales data. Id. ¶ 66. Success
further represented that it needed another advance payment to
effectuate the completion of these conversions. Id. ¶ 69. In
good faith and in reliance on these representations, Plaintiff
agreed to provide yet another additional advance payment of
$691,000 on January 12, 2011 that it otherwise had no obligation
to make under the GSA. Id. ¶ 70.

Ultimately, as of the date Success provided its notice of
termination of the GSA, Success had converted only 88 retail
stores of the 1,222 it had agreed to convert under the GSA. Id.
¶ 78.

8

### 2. *Transmission of Data*

In addition to its failure to convert stores as agreed upon in the GSA, in violation of both the CA and the GSA, Success transmitted to Plaintiff data which disregarded Plaintiff's instructions.  Id. ¶ 87-88.  At the outset of the Automation Project, Plaintiff instructed Success not to attempt on its own to "estimate" data that was missing from the transmissions.  Id. Plaintiff made this instruction based on the fact that its Measurement Science personnel had developed expertise and its own algorithms and/or procedures for redressing missing data in statistically and sound ways.  Id.  In disregard of Plaintiff's instructions, Success routinely did not notify Plaintiff of instances in which data had been recreated and instead transmitted this recreated data to Plaintiff without identifying it as such.  Id.

### E. Communications between Plaintiff and Success' Employee

From December 2010 through August 2011, Plaintiff received numerous emails, sent from various e-mail addresses, from an unidentified individual who alleged that Success had defrauded Plaintiff since the start of its performance under the GSA. (Answer to Pl.'s Am. Compl. and Countercl. ("Countercl.") ¶93.) Although the sender did not identify himself in the e-mails, these e-mails were sent by a disgruntled employee of Success,

Scott Sottile ("Sottile"), and Plaintiff quickly became aware
that Sottile was the unidentified sender.  Id. ¶ 93, 119.

 In Sottile's first e-mail correspondence with Plaintiff, on
December 3, 2010, he wrote to Plaintiff's Chief Legal Officer
and inquired as to whether, in the event that he disclosed his
knowledge of fraud at one of Plaintiff's contractors, Plaintiff
would "protect" him by covering lost salary and incurred legal
fees that could result from his disclosure.  Id. ¶ 100.  Through
its Chief Legal Officer, Plaintiff responded to Sottile on
December 3, 2010 that, "[w]hile we cannot give you the
assurances and indemnification you are looking for, we would
like to see if there is a way to obtain information from you
that would not identify you to us or your employer but would
give us the capability to investigate the matter independently."
Id. ¶ 102.

 Although Sottile initially responded to Plaintiff's
December 3, 2010 e-mail on December 5, 2010 that,
"[u]nfortunately, 'cannot give you the assurances and
indemnification' is a show stopper for me.  I would be the
primary – only, really – suspect if you were to start
investigating us – As I said, I am the one who is forced to fake
the data," over the next several months, Sottile continued to
correspond with Plaintiff's representatives via telephone and e-
mail.  Id. ¶¶ 103-120.  In his communications with Plaintiff,

Sottile provided Plaintiff with information and documents that
Success had marked as "Confidential" and "Draft." Id. ¶¶ 116.
Sottile also provided Plaintiff with materials relating to the
instant litigation that were subject to attorney client
privilege. Id. ¶ 136.

Plaintiff corresponded with Sottile through a number of
different channels over the course of several months, but at no
time did Plaintiff ever inform Success of these communications.
Id. ¶¶ 98-99. Plaintiff instead kept its communications with
Sottile hidden from Plaintiff, even after being informed by
Success that Sottile should be removed from all distribution
lists with Plaintiff. Id. ¶ 127.

On March 16, 2011, after it had been corresponding with
Sottile for months, Plaintiff communicated to Sottile that "[i]n
view of the current prospect of litigation, we do not feel
comfortable receiving any additional information of further
communications from you." Id. ¶ 135.

### F. Termination of the Parties' Agreement

On March 4, 2011, Success sent Plaintiff a letter, through
counsel, claiming that Plaintiff was in breach of the GSA.
Plaintiff's counsel responded to this letter on March 17, 2011,
in a letter which informed Success that it was in breach.

As of April 1, 2011, Success discontinued providing
Plaintiff with status reports as to its recruitment and

conversion of retail stores, and as of April 8, 2011, Success

ceased its daily operations calls with Plaintiff.  (Am. Compl. ¶

76.)

On April 26, 2011, Success provided written notice of its

termination of the GSA.  Id.

## II.   DISCUSSION

### A. Legal Standard

In assessing a motion to dismiss under Rule 12(b)(6), a

court accepts as true all non-conclusory factual allegations and

draws all reasonable inferences in the plaintiff's favor.

Goldstein, 516 F.3d at 56.  Although a complaint need not

contain "'detailed factual allegations'" to survive a motion to

dismiss, there must be "sufficient factual matter" which, if

accepted as true, would "'state a claim to relief that is

plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)).  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer

possibility that a defendant acted unlawfully."  Id.

Accordingly, a pleading that merely offers "labels and

conclusions" or "a formalistic recitation of the elements of a

cause of action will not do."  Twombly, 550 U.S. at 555.

Moreover, any claims sounding in fraud must also meet the

heightened pleading requirements of Federal Rule of Civil

12

Procedure 9(b).  Such claims must state "with particularity the circumstances constituting [the] fraud." See Fed. R. Civ. P. 9(b).  Rule 9(b)'s particularity requirement entails that the plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004) (internal quotations omitted).

## B. Defendants' Motion to Dismiss

For the reasons discussed, the Court: (1) denies Defendants' motion to dismiss the second cause of action for breach of the CA; (2) grants Defendants' motion to dismiss the cause of action against Novick, but only as to the claims based on statements made outside of the Proposal; and (3) denies the Defendants' motion to dismiss the Amended Complaint's third cause of action against Tarlow and Success.

### 1. Cause of Action for Breach of the CA

Defendants argue in their motion to dismiss that the Amended Complaint fails to adequately plead its second cause of action against Success for breach of the CA because: (1) it fails to allege any breach of the CA's terms; and (2) it fails to plead any facts relating to the damages attributable to the

13

alleged breach.  With respect to their first argument,
Defendants essentially argue that, since the CA does not
explicitly prohibit Success from recreating missing data,
Success' recreation of missing data cannot be considered a
breach of any term of the CA.  With respect to their second
argument, on the issue of damages, Defendants argue that, in
light of Plaintiff's admission that it produces its own
estimates to redress missing data, Plaintiff cannot allege that
it was harmed by Success, performing the exact same exercise.

The Court finds both of Defendants' arguments unavailing.
The Amended Complaint alleges that Success committed itself in
the CA to "collect[ing] and deliver[ing] to [Plaintiff] the
scanning data. . . ."  (Am. Compl. ¶ 12.)  Because a unilateral
recreation of missing data could not have been "collect[ed]" as
provided for by this provision of the CA, "constru[ing] the
complaint liberally, accepting all factual allegations in the
complaint as true, and drawing all reasonable inferences in the
plaintiff's favor," Looney v. Black, 702 F.3d 701, 719-20 (2d
Cir. 2012), the Court finds that the Amended Complaint
adequately pleads a breach of the CA.  The Court similarly finds
that, having alleged both that Plaintiff has developed its own
expertise at redressing missing data and that it sells this data
to retail clients, (Am. Compl. ¶¶ 8, 87), the Amended Complaint
sufficiently pleads that Plaintiff would be damaged by an

inability to ensure the validity of data being provided to its clients.  Success' argument that Plaintiff cannot demonstrate damages since its method of recreating data does not differ from that undertaken by Success has no impact on the Court's decision, as the Court draws all reasonable inferences in Plaintiff's favor when deciding a motion to dismiss.

### 2. *Cause of Action for Fraud and Misrepresentation*

Defendants' second argument in their motion to dismiss is that the Amended Complaint's cause of action for fraud and misrepresentation should be dismissed in its entirety as to Novick and dismissed in part as to the remaining defendants.

#### a) *Claims against Novick*

With respect to Novick, the Defendants argue that Plaintiff cannot assert their sole claim against this defendant because: (1) the Amended Complaint does not attribute any of the allegedly fraudulent statements to Novick; (2) the Amended Complaint does not allege that Novick had a duty to disclose to Plaintiff such that her omissions can be considered the basis for a fraud claim; and (3) the merger clause of the GSA bars any fraud claim relating to misrepresentations made prior to the GSA.  Since the Amended Complaint alleges that "[u]pon information and belief" Novick provided input to the Proposal

15

which contained the allegedly fraudulent misrepresentations,[2] the first two of Defendants' arguments relating to Novick only apply to statements made outside of the Proposal itself.  The Court addresses these arguments first before turning to Defendants' third argument that the GSA's merger clause precludes the Amended Complaint's claims which relate to statements made by Novick in the Proposal.

In its opposition to Defendants' motion, Plaintiff does not contest Defendants' assertion that the Amended Complaint fails to attribute any allegedly fraudulent statements, other than those contained in the Proposal, to Novick.  Therefore, in order to establish Novick's liability for statements made outside the Proposal, the Amended Complaint must plead a duty to disclose that Novick owed to Plaintiff.  See United States v. Szur, 289 F.3d 200, 211 (2d Cir. 2002) ("[W]hen dealing with a claim of

---

[2] Because the precise degree and extent of Novick's contributions to the Proposal are peculiarly within Defendants' knowledge and Plaintiff has plead facts relating to Novick's role at Success that provide a basis for its belief that she had input into the Proposal, the Court finds that Plaintiff's pleading "upon information and belief" satisfies Rule 9(b) with respect to fraudulent misrepresentations made by Novick in the Proposal. See DiVitorrio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) ("There is a recognized exception to [the rule that Rule 9(b) pleadings cannot be based upon information and belief] . . . fraud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based.")

fraud based on material omissions, it is settled that a duty to disclose 'arises only when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'") (citing Chiarella v. United States, 445 U.S. 222 (1980)).

The Court finds that the Amended Complaint does not assert any relationship between Novick and Plaintiff that would give rise to a duty of disclosure and, although Plaintiff argues that Novick's positions as CFO and majority shareholder of Success give rise to such a duty, Plaintiff has provided the Court with no legal grounds to support such a position.  The Court accordingly finds that the Amended Complaint has failed to allege a fraud claim as to Novick for misrepresentations made outside of the Proposal.

The Defendants' primary argument in support of dismissing the claims against Novick that relate to the Proposal is that the merger clause of the GSA bars any fraud claim relating to misrepresentations made prior to the GSA.  Because this same argument is also made in support of the motion to dismiss certain claims against Tarlow and Succes, the Court now addresses this argument as it pertains to all three defendants.

17

### b) *Impact of the GSA's Merger Clause on Plaintiff's Fraud Claims based on Statements Made prior to the GSA*

Defendants argue that the GSA's merger clause precludes Plaintiff from bringing fraud and misrepresentation claims for statements made prior to the parties' entering the GSA.  In making this argument, Defendants rely upon the following language from the GSA:

> This Agreement, together with the Exhibits attached hereto, constitutes the entire understanding of the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, proposals or representations, written or oral, between the Parties relating to the subject matter of this agreement.

Decl. of Joseph M. Pastore III in Supp. Mot. to Dismiss ("Pastore Decl."), Ex. B. Section 12.13.  Defendants argue that this provision of the GSA precludes Plaintiff from now alleging fraud claims for statements that were made prior to the parties' execution of the GSA.

The Court of Appeals for the Second Circuit has held that "a general merger clause is ineffective . . . to preclude parol evidence that a party was induced to enter the contract by means of fraud."  Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993).  Therefore, "even when the contract contains 'an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made,'" a party may still assert that "he was induced to enter the contract by fraud." Id. (quoting Danann Realty Corp. v. Harris, 5 N.Y.2d

18

317, 320 (1959)).  An exception to this general rule arises,
however, when "the contract states that a contracting party
disclaims the existence of or reliance upon specified
representations."  Id.  In such cases, "that party will not be
allowed to claim that he was defrauded into entering the
contract in reliance on those representations."  Id.  In order
to be considered sufficiently specific to bar a party's claim
for fraud in the inducement, the contract language "must contain
explicit disclaimers of the particular representations that form
the basis of the fraud-in-the-inducement claim." Id. at 316
(citing Grumman Allied Indus. v. Rohr Indus., Inc., 748 F.2d 729
(2d Cir. 1984)).

Reviewing the allegations in the Amended Complaint and the
GSA, this Court finds that the general terms of the GSA's merger
clause are insufficient to preclude the Amended Complaint's
fraud claims.  The language of the merger clause does not
explicitly disclaim the alleged misrepresentations made in the

Proposal, nor does it express the parties' absolute intent to make their acceptance unconditional.[3]

In reaching its decision, the Court acknowledges both the Plaintiff's sophistication and the multi-million dollar project at issue.  See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 165 F. Supp. 2d 615, 623 (S.D.N.Y. 2001) ("In evaluating justifiable reliance, the plaintiff's sophistication and expertise is a principal consideration.")  Although the Court agrees with Defendants that a sophisticated party such as Plaintiff faces a greater hurdle in establishing justifiable reliance, id., particularly in light of the fact that Defendants' alleged misrepresentations about the functionality of the Software Applications were made not simply in the Proposal but also in the GSA itself, see e.g., Pastore Decl., Ex. B, 14 and 33, the Court finds that the GSA's merger clause does not prevent Plaintiff from establishing its justifiable reliance in the instant action.

---

[3] These facts distinguish the present action from the two New York Court of Appeals cases relied upon by Defendants.  See Danaan Realty Corp. v. Harris, 5 N.Y.2d 317, 320 (N.Y. 1959) ("Here, however, plaintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded.") and Citibank, N.A. v. Plapinger, 66 N.Y.2d 90 (N.Y. 1985) (Guarantor defendants who had expressly agreed that their guarantee was "absolute and unconditional" were barred from asserting that their guarantee was conditioned on representations made by the plaintiff bank).

Because the Court finds that the GSA's merger clause does not preclude Plaintiff from bringing a cause of action for fraud based on statements made prior to the GSA and because the Amended Complaint "gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based," In re Bristol Myers Squibb Co. Secs. Litig., 586 F. Supp. 2d 148, 162 (S.D.N.Y. 2008) (internal citations omitted), the Court denies the Defendants' motion to dismiss the Amended Complaint's third cause of action against Tarlow and Success.  The Court similarly denies the Defendants' motion to dismiss the claims against Novick that are based on statements made in the Proposal.

### C. Plaintiff's Motion to Dismiss

Plaintiff has filed a motion to dismiss Count Thirteen of Success' counterclaims, which asserts a cause of action for aiding and abetting Sottile's breach of his fiduciary duty to Success.  A claim for aiding and abetting a breach of fiduciary duty requires (1) "a breach by a fiduciary of obligations to another, of which the aider and abettor had actual knowledge," (2) "that the defendant knowingly induced or participated in the breach," and (3) "that plaintiff suffered damage as a result of the breach."  In re Sharp Inter. Corp., 403 F.3d 43, 49-50 (2d Cir. 2005) (internal citations omitted).  Plaintiff argues in its motion that, even assuming the truth of the counterclaims'

allegations, Success has failed to plead this cause of action because it has not alleged that: (1) Plaintiff had actual knowledge of Sottile's fiduciary obligations to Success; (2) Plaintiff "substantially assisted" in Sottile's breach; and (3) Success had an affirmative obligation to disclose its communications with Sottile to Success.

The Court has reviewed the counterclaims and the parties' submissions and, upon completing this review, finds that Success has adequately plead a cause of action for aiding and abetting a breach of fiduciary duty against Plaintiff.

### 1. *Plaintiff's Knowledge of Sottile's Fiduciary Duties*

Plaintiff's first argument in support of its motion to dismiss the counterclaim is that this claim cannot survive because Plaintiff was unaware of any fiduciary duty that Sottile owed to Success.  The thrust of Plaintiff's argument on this point is that, because Sottile never informed Plaintiff of a fiduciary duty that he owed to Success, Success cannot plead the actual knowledge element of its claim.

The Court finds Plaintiff's argument unavailing.  As a matter of law, "[a]n employee owes a fiduciary duty to his employer" and "is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost faith and loyalty in the performance of his duties."  Louis Capital Mkts., L.P., 801 N.Y.S.2d 490, 495

(N.Y. Sup. Ct. 2005) (quoting <u>Lamdin v. Broadway Surface Adver.</u> <u>Corp.</u>, 272 N.Y. 133, 138 (N.Y. 1936)).  Beyond that, however, Success' counterclaims allege that: (1) Plaintiff quickly learned that Sottile was the author of the e-mails it had received, (Countercl. ¶ 119); (2) Sottile informed Plaintiff that he could be terminated or sued by Success for his actions, <u>id.</u> ¶ 100; and (3) Plaintiff's Chief Security Officer spoke to Sottile regarding his desire to be indemnified from "any adverse consequences resulting from his providing confidential information" to Plaintiff, <u>id.</u> ¶¶ 111-112.  That Sottile himself gained nothing from his disclosures, or that he lacked certainty as to whether he would be terminated or sued, does not change the Court's view that the counterclaims have plead sufficient facts for the factfinder to draw a reasonable inference that Plaintiff had actual knowledge that Sottile was breaching a fiduciary duty he owed to Success.

### 2. *Plaintiff's Participation in Sottile's Breach*

Plaintiff's next argument against Success' counterclaim is that this cause of action must fail because Success has not alleged that Plaintiff participated in Sottile's breach.  Under New York law, "[a] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator."  <u>Kaufman v. Cohen</u>, 760 N.Y.S.2d 157, 170 (N.Y. App. Div. 2003).  "Substantial

23

assistance" is further defined as "when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."  Id. Although failure to act can indeed give rise to aiding and abetting liability, "the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."  Id.

Plaintiff argues that, while the counterclaims describe in detail the numerous communications that occurred between Plaintiff and Sottile, they do not allege that Plaintiff ever provided any substantial assistance to Sottile.  Instead, as argued by Plaintiff, the counterclaims merely allege that Plaintiff passively received information which Sottile himself chose to disclose.

While the Court acknowledges that Success' counterclaims do not allege that Plaintiff initiated contact with Sottile or directed any of his disclosures, the Court disagrees with Plaintiff's characterization that its alleged actions cannot be viewed as substantial assistance.  The counterclaims allege specific instances in which Plaintiff: (1) informed Sottile that it would not reveal his identity to Success, (Countercl. ¶¶ 106 and 110); (2) sought to alleviate Sottile's concerns regarding his disclosure, (Countercl. ¶ 111); and (3) declined to disclose its prior communications with Sottile, even after Success

24

notified Plaintiff of its own concerns regarding Sottile,
(Countercl. ¶¶ 128, 137).  Taken together, these alleged facts
could permit the factfinder to find that Plaintiff enabled
Sottile's breach by: (1) providing him with affirmative support;
and (2) actively helping him to conceal his breach.  The Court
accordingly finds that Success has adequately plead the
substantial assistance element of its claim.[4]

---

[4] Having found that the counterclaims adequately plead that
Plaintiff provided Sottile with substantial assistance in his
breach, the Court need not address Plaintiff's second argument
that it cannot be held liable for its failure to act because it
owed no duty to Success.

III.    CONCLUSION

The Court grants in part and denies in part the Defendants'
motion to dismiss [dkt. no. 55].  The claims against Novick for
statements made outside of the Proposal are dismissed.  The
Court denies, however, the Defendants' motion to dismiss as to:
(1) the claims against Novick which relate statements made in
the Proposal; (2) the cause of action for breach of the CA
against Success; and (3) the fraud and misrepresentation claims
against Tarlow and Success.

The Court also denies Plaintiff's motion to dismiss
Success' claim for aiding and abetting a breach of fiduciary
duty [dkt. no. 60].

Counsel shall confer and inform the Court by letter no
later than one week from the date hereof how they propose to
proceed.


SO ORDERED:

_____

LORETTA A. PRESKA
CHIEF UNITED STATES DISTRICT JUDGE


Dated:    New York, New York
          March 19, 2013

26