USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   8/18/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

THE NIELSEN COMPANY (US), LLC,                    :

                           Plaintiff,       :        **AMENDED OPINION
                                        AND ORDER_____**

       - against -                              :        11cv2939-FM

SUCCESS SYSTEMS, INC.,                           :

                        Defendant.        :

---------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

        In this diversity contract action, plaintiff The Nielsen Company ("Nielsen")

seeks to recover the damages allegedly arising out of its failed business relationship with

defendant Success Systems, Inc. ("Success"). Nielsen had retained Success to help

automate its collection of data from a statistically-representative sample of independent

and small-chain convenience stores. Nielsen's Amended Complaint contains three claims

for relief sounding in breach of contract and fraud. (ECF No. 53 ("Am. Compl.") ¶¶ 90-

111). Success, in turn, has asserted fourteen counterclaims, including claims for breach

of contract, of an oral amendment, and of the duty of good faith and fair dealing, fraud,

tortious inference with contract and economic advantage, trade defamation, breach of a

court order, aiding and abetting the breach of a fiduciary duty, and violation of the

Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq.

(ECF No. 58 at 20-84 ("Countercls.")).

The parties have cross-moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure with respect to most of the claims.  For the reasons set forth below (and as I previously indicated in an Order dated March 31, 2015 (ECF No. 166)), both Nielsen's motion, (ECF No. 123), and Success' motion, (ECF No. 126), are granted in part and denied in part.

Success also has moved to modify a protective order that I entered on November 9, 2011, (ECF No. 33), in order to be able to use information obtained in this case in connection with a proposed lawsuit in Connecticut state court against certain Nielsen employees.  Nielsen opposes modification of the protective order and has moved to enjoin Success from bringing any state court claim that would have constituted a compulsory counterclaim in this action.  For the reasons set forth below, both those motions, (ECF Nos. 154, 158), are denied.

I.    Background

    A.    Parties

        Nielsen is a Delaware limited liability company that provides numerous services, including "a broad range of analytics and market data to the consumer packaged goods . . . industry."  (ECF No. 139 (Pl.'s Stmt. of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1 Stmt.")) ¶ 1).[1]  In furtherance of this business, Nielsen collects, aggregates, and analyzes sales data from independent and small-chain

---

[1]    When only one party's Rule 56.1 Statement is cited, the other party's Rule 56.1 counterstatement either does not dispute the fact alleged or fails to cite admissible evidence supporting its position.

convenience stores in order to produce market research reports that are licensed to various manufacturing and retail clients.  (Id. ¶¶ 2-4).

Success is a Connecticut corporation that "supplies software and web-based applications" to retail stores seeking to improve business operations.  (Countercls. ¶¶ 1, 7).

B.    Automation Project

1.    Demand for Automation

In 2010, Nielsen was collecting sales data manually from a pool of 1,222 convenience stores across the United States.  (Pl.'s 56.1 Stmt. ¶ 5).  Nielsen used the data collected from these statistically-representative stores, selected to fill specific geographic slots (the "Original Pool"), to produce monthly market research reports.  (Id. ¶¶ 6-7, 9).  Because the manual collection process was inefficient, Nielsen began to explore automating its data collection from the Original Pool so that it could produce more frequent weekly research reports.  (Id. ¶¶ 8, 10-11).

In the latter half of 2010, Nielsen surveyed the stores comprising the Original Pool to assess their willingness to automate their data collection mechanisms.  (Id. ¶ 14).  The survey sought to determine whether the Original Pool stores were willing to automate "without any offer by Nielsen to fund the stores' cost of automation."  (Id. ¶ 15; ECF No. 134 (Aff. of Brian Moran, sworn to on Apr. 1, 2014 ("Moran Aff.")), Ex. 5 ("LeClair Dep. I") at 40).  Approximately one-third of the stores responding expressed some interest in automating.  (Pl.'s 56.1 Stmt. ¶ 15; LeClair Dep. I at 41).  Bouyed by

these results, Christopher LeClair, Nielsen's Vice President of Professional Services,

concluded that as many as fifty to seventy percent of stores might be willing to automate

their data reporting if the costs of doing so were subsidized by Nielsen.  (Pl.'s 56.1 Stmt.

¶ 16; LeClair Dep. I at 108).

        2.     General Services Agreement

        In August 2010, Nielsen circulated a "Request For Proposal" seeking a

contractor to assist the company in converting "1,222 [i]ndependent and [s]mall [c]hain

convenience stores from manual inventory audit to quality scanned inventory."  (See ECF

No. 137 (Aff. of Christopher LeClair, sworn to on Mar. 29, 2014 ("LeClair Aff.")), Ex. 1

("RFP") at 7).  Although the RFP for this project (the "Automation Project") identified

several distinct sources from which the contractor could recruit stores, (id.), Nielsen's

analytics department had articulated to LeClair the importance of retaining as many

Original Pool stores as possible to maintain "validity and historical consistency . . . from a

statistical, demographic and scientific standpoint."  (LeClair Aff. ¶ 17).

        Success submitted a proposal to Nielsen in response to the RFP.  (See

LeClair Aff. Ex. 2).  Nielsen selected the Success proposal, in part, because of a

preexisting business relationship between the two companies.  (LeClair Aff. ¶ 69; LeClair

Dep. I at 59).  That relationship dated back to a February 2009 Cooperation Agreement,

pursuant to which approximately thirty stores affiliated with Success had been providing

sales data to Nielsen.  (Pl.'s 56.1 Stmt. ¶ 68; see ECF No. 141 (Aff. of Brian Moran,

sworn to on May 2, 2014 ("Moran Aff. II")), Ex. 4 ("Cooperation Agreement")).

In early October 2010, Nielsen and Success entered into a General Services Agreement ("GSA") in connection with the Automation Project.  Both parties' contractual obligations were further delineated in an attached Statement of Work ("SOW").  (See LeClair Aff. Ex. 3 (GSA) § 2.1; GSA Ex. A (SOW)).  Section 2.2 of the GSA, captioned "Change in the Statement of Work," authorized Nielsen to "make changes . . . to the [SOW], including the right to make changes in the method or manner of performance," but required Nielsen to provide an equitable adjustment and modify the GSA if "the change in the scope of [s]ervices significantly increase[d] or decrease[d] the cost of or the time for performance."  (Id. § 2.2).  Section 12.6 of the GSA provided that the GSA could "not be modified, changed or amended, except by written agreement signed by authorized representatives of both [Nielsen and Success]."  (Id. § 12.6).

The SOW expressly identified three sources from which Success could recruit stores for the Automation Project:  (a) 299 stores within Success' existing sample preapproved by Nielsen as substitutes for Original Pool stores, also referred to as "Existing Store[s];" (b) additional stores outside of Success' existing sample, to be "selected by Nielsen," also referred to as "New Store[s];" and (c) a "Farm System" of approximately 5,000 stores that Nielsen had pre-approved to "address [s]tore [a]ttrition issues."  (SOW at 1; Pl.'s 56.1 Stmt. ¶ 105).  The SOW required Success to approach recruitment by (a) "[u]tiliz[ing s]tores currently within [Success'] programs – if applicable," (b) "[u]tiliz[ing s]tores currently cooperating within Nielsen's manual inventory audit program – if applicable," (c) "capitaliz[ing] on Existing Stores," (d)

5

incentivizing stores otherwise unwilling to automate, and (e) "[i]mplement[ing] New Stores within the defined segment parameters and geographical dispersement [sic]." (SOW at 2).  Prior to automating a New Store, Success was required to "[g]ain approval from Nielsen," with the SOW providing a mechanism for obtaining Nielsen's consent. (Id. at 2, 6).  Additionally, the SOW required Success to collect data on a weekly basis from the automated stores and provide Nielsen with "100% accurate" data.  (Id. at 1-3, 10).

The SOW obligated Nielsen to provide Success with a $999,000 advance upon execution of the GSA, in anticipation of the successful automation of 333 stores.  A subsequent payment of $999,000 was contingent upon the successful automation of an additional 333 stores by December 31, 2010, and a final payment of $1,229,800 was contingent upon the successful automation of the remaining 556 stores by January 3, 2011.  Additionally, Success was entitled to receive payments after the Automation Project was completed for collecting and providing data from the automated stores on an ongoing basis.  (Id. at 8-9).

### 3.   Alleged Modifications

#### a.   Exhaustion

Before the ink on the GSA was dry, the parties began to disagree about their respective contractual obligations.  On October 8, 2010, in an email challenging Nielsen's summary of a conference call held earlier that day, Scott Tarlow, the president of Success, indicated that Success could not guarantee that stores in the Original Pool would

6

be "chosen over" any alternative store if the alternative store "express[ed an] ability to accept [an] offer [first]."  (ECF No. 132 (Def.'s Stmt. of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1 Stmt.")), Ex. 34 at 1).[2]  Tarlow explained that the Original Pool stores could not be "worked or prioritized sequentially" because of the tight three-month time frame for the Automation Project.  (Id.).

In response, LeClair expressed concern that Success' approach did not conform to the GSA, observing that "Nielsen ha[d] stated multiple times the importance of [stores in the Original Pool] being converted," and that "priority must be given to the [Original Pool]."  (Id.).  LeClair emphasized that giving the Original Pool stores "priority" required that Success make "every possible attempt" to have an Original Pool store say yes to converting.  LeClair explained – and suggested that Tarlow had agreed – that this required "three valid attempts."  LeClair also indicated that Nielsen was willing to "put additional steps into the process to ensure these attempts."  (Id.).  Additionally, according to LeClair, if the three attempts to recruit an Original Pool store were unsuccessful, Success still could not recruit simply any alternative store, but instead had to follow a "priority order" that ranked Nielsen's Farm System stores over other nonaligned alternative stores.  (Id.).

On October 11, 2010, Tarlow requested 14,000 additional store names for AnswerNet, a telemarketing contractor that Success had retained to assist in the

---

[2]     Subsequent citations to "Ex." refer to the exhibits annexed to Success' Local Civil Rule 56.1 Statement.  (See ECF No. 132).

recruitment of stores.  (Ex. 33 at 9; see Moran Aff. Ex. 7 ("AnswerNet Contract")).  This

request exacerbated LeClair's concern that stores in the Original Pool and Farm System

were not being prioritized sufficiently and were "going to be missed, skipped over, [and]

not given full attempts to convert."  (Id. at 7-8; see LeClair Dep. I at 96-97).  Although

Tarlow acknowledged that "all of these things may happen," he explained that to have

"1,222 stores delivering . . . data by [December 31, 2010]," Success needed to approach

the list "in parallel [and] not sequentially."  (Ex. 33 at 7).  Tarlow further insisted that

Success had always described their approach as "first come first serve," or "parallel," and

that an approach focused on ensuring that each store in the Original Pool received as

many opportunities as necessary to decide whether to convert before any other stores

were approached would "slow down the deliverables."  (Id.).

On October 12, 2010, LeClair insisted that Success make "[six] calls to the

1,222 Nielsen Stores and [six] calls to [the] 5,000 backups."  (Ex. 35 at 1; see id. at 2

("[I]f it takes 3, 4, 5 ,6 calls to [reach a store] then so be it.")).  In response, Tarlow

contacted Thad Taylor ("Taylor"), another Nielsen official involved in the Automation

Project, to inform him that the GSA would have to be modified, and that LeClair's

request would "have a negative impact on the deliverable dates."  (Id. at 1; see also Ex. 23

at 1 ("[T]he requested modification certainly extends the project.")).  On October 21,

2010, Tarlow reiterated that Nielsen's request had "significantly delayed/impeded

[Success'] ability to perform under the current timelines," and that "there has to be some

understanding as to the repercussions/impact on the deliverables by making these

8

changes." (Ex. 22 at 1). The delay, Tarlow explained, was the result of requiring

AnswerNet's operators to keep calling seemingly uninterested stores, rather than reaching

out to potential replacement stores. (Ex. 35 at 4; see id. at 3 ("If I have to wait a month to

exhaust 1,222 and they are all 'touched,' game over . . . Do the math . . . [i]f you need the

1,222 exhausted you need to push the date, if you want us to have 1,222 running by

[December 31] then you need to let us run our show.") (first ellipsis in original).

b.   <u>Subsequent Developments</u>

Based on Nielsen's alleged modifications, Success estimated that the

Automation Project could not be completed until March 31, 2011, and then only if

Nielsen was willing to infuse the Automation Project with more cash. (See Ex. 26 at 12-

13; Moran Aff. Ex. 1 at 15-38 ("Tarlow Dep. I") at 59). Accordingly, Tarlow indicated to

both LeClair and Taylor on multiple occasions that the GSA needed to be amended to

reflect the changes mandated by Nielsen. (See, e.g., Ex. 22 at 1; Ex. 23 at 1).

On October 26, 2010, LeClair responded that, while he "still d[id] not agree

that [Nielsen] added any costs besides Nielsen internal costs to this agreement," Nielsen

would "provided an updated agreement." (Ex. 15 at 1). That updated agreement, LeClair

elaborated, would focus primarily on extending the time for Success to perform its

obligations under the GSA. (Id.). Two days later on October 28, LeClair acknowledged

the "dynamic" nature of the Automation Project, and recognized that, inasmuch as "every

SOW has give and take and this one appears to have more," Nielsen was willing to

9

"work/change the SOW." (Ex. 40 at 1). LeClair therefore suggested that Tarlow "relax"

insofar as he feared that Nielsen would impose "contract penalties" for delay. (Id.).

In December 2010, Nielsen added an additional seventy slots to its

statistical sample, bringing the number of stores that required automation to 1,292.

(Ex. 18 at 1; Pl.'s 56.1 Stmt. ¶ 189). Success agreed to incorporate these seventy slots

into the Automation Project. (Pl.'s 56.1 Stmt. ¶¶ 190-94). Nielsen also identified

approximately 100-150 stores in the Original Pool that already were automated, but

preferred to send their data directly to Nielsen, bypassing Success during both the

automation and data reporting stages. (Id. ¶¶ 170-71). Nielsen directed those stores to

report directly, but gave Success "full credit" for the stores both in connection with the

GSA deadlines and with respect to progress payments. (Id. ¶¶ 172-73; see Ex. 41 at 1).

Nielsen's statistics department also determined that only 111 of the 299 stores historically

affiliated with Success ("Success Stores") were suitable to fill a slot in Nielsen's sample,

although they all had been pre-approved for participation in the Automation Project.

(Pl.'s 56.1 Stmt. ¶ 175). This required Success to automate 188 more slots than had been

anticipated when the GSA was executed. (Id. ¶ 176). As a result, Nielsen agreed to pay

Success an additional $50,000 to purchase more hardware, and $100,000 for financial

incentives for the additional stores. (LeClair Aff. ¶ 120; Pl.'s 56.1 Stmt. ¶ 179). Nielsen

also agreed to extend the deadline by which Success was required to complete the

Automation Project to February 28, 2011, advanced an additional $691,000 (which

included the $150,000 previously promised), and agreed not to pursue delay penalties authorized by the GSA. (Pl.'s 56.1 Stmt. ¶¶ 181-83).

During this time, Taylor and Tarlow discussed the contours of a possible amendment to the GSA, floating the possibility of "amending the payment schedule [and] formula" and "re-establish[ing] expectations as they relate . . . [to contractual] penalties." (See Ex. 16 at 2). That same month, Taylor and LeClair agreed to "work up an amendment document" reflecting a target completion date of February 28, 2011, for the successful automation of all 1,292 stores. (Ex. 20 at 1-2).

In February 2011, Taylor reaffirmed to Tarlow that drafting an amendment to the GSA was a "priority." (Ex. 21 at 1). A proposed amendment was drafted and circulated among Nielsen officials, but was not provided to Success. (See LeClair Dep. I at 137-39; Ex. 8 ("Taylor Dep.") at 239-41). The proposed amendment would have reflected the increase in the number of slots requiring automation from 1,222 to 1,292, acknowledged Nielsen's promise to pay Success an additional $150,000 for hardware costs and incentives, and extended Success' time to complete the Automation Project from January 3 to February 28, 2011. (See ECF No. 144 (Aff. of Brian Moran, sworn to on May 21, 2014), Ex. 1 ("Proposed Amendment")).

4.    Death of the Automation Project

By February 2011, the Automation Project was in trouble: only 66 of the 1,292 stores requiring automation were successfully reporting data. (Pl.'s 56.1 Stmt. ¶ 217). On February 12, 2011, Tarlow indicated that the Automation Project could

11

continue "well into 2012," and requested an additional $2 million to "reengineer" the project.  (Tarlow Dep. I at 58-59; Pl.'s 56.1 Stmt. ¶¶ 204-208).  This exacerbated Nielsens' already considerable angst.  As a consequence, during an internal management meeting on February 15, 2011, Nielsen determined that it was necessary to scale back Success' role in the Automation Projection.  (LeClair. Aff. ¶ 166; Pl.'s 56.1 Stmt. ¶¶ 247-48).

Nielsen decided to limit Success' role in the Automation Project to completing the automation of the 488 stores it had successfully recruited, thereby eliminating Success' further recruitment efforts.  (Pl.'s 56.1 Stmt. ¶¶ 249-50, 252, 255).  On March 25, 2011, Nielsen's counsel provided Success' counsel with a written proposal for modification reflecting this revised course.  (See LeClair Aff. Ex. 12).[3]  Further proposals were exchanged on April 5 and 14, 2011.  (LeClair Aff. Exs. 13-14).  Despite these attempts, the parties never executed any written amendment to the GSA.  (Pl.'s 56.1 Stmt. ¶ 257).  Instead, on April 26, 2011, Success terminated the GSA, citing Nielsen's alleged failure to cure its breach of the GSA.  (Ex. 9).  By the time it took this action, fewer than ninety of the 488 stores Success had recruited were generating weekly data feeds.  (Pl.'s 56.1 Stmt. ¶ 278).

---

[3]     The cover letter indicated that the proposal was tendered for settlement purposes and in anticipation of litigation.  (LeClair Aff. Ex. 12).

C.    <u>Sottile Correspondence</u>

Unbeknownst to Success, during the pendency of the parties' business relationship, an anonymous Success employee, later revealed to be Scott Sottile ("Sottile"), had communicated with numerous Nielsen employees, claiming that Success had engaged in ongoing fraudulent practices at Nielsen's expense.  (<u>See</u> Ex. 7).  These communications began on December 3, 2010, when James Cuminale ("Cuminale"), Nielsen's Chief Legal Officer, received an email sent from the email address "johndoe99999023@gmail.com."  The sender stated that he worked "at one of [Nielsen's] contractors," and that "[e]very day, week, [and] month" the contractor was committing "fraud . . . against Nielsen by faking data and submitting it to Nielsen as actual data."  (Ex. 50 at 3-4).  Nielsen employees exchanged emails with John Doe through mid-January, but the sender's and contractor's identities were not disclosed.  (Id. at 1-4).

On February 16, 2011, Taylor received an anonymous email from Sottile, who was using the address "fraudandliesatsuccess@gmail.com."  (Ex. 37 at 3-4).  In that communication, Sottile identified Success as the vendor engaged in fraud.  Sottile also indicated that he had "information you need to know about Success Systems."  (<u>Id.</u> at 4).  Taylor initially rebuffed Sottile, responding that "[t]his is not how Nielsen does business," but he eventually agreed to keep the identity of the sender anonymous, and not to use any information provided by Sottile in a way which would reveal to Success that one of its employees was communicating with Nielsen.  (<u>Id.</u> at 2-3).  With this assurance,

13

Sottile explained that the data Success was sending to Nielsen from the automated stores was partially fabricated.  Specifically, Sottile accused Tarlow of forcing Success to fabricate any data that was missing in order to make it "look[] perfect" to Nielsen.  (Id. at 1-2).

On February 24, 2011, Robert Messemer ("Messemer"), Nielsen's Chief of Security, contacted Sottile to express his interest in receiving additional information.  (Ex. 49 at 2).  Messemer promised that Nielsen "would not disclose the scope of [the sender's] cooperation to [his] employer."  (Id.).  Eventually, Sottile provided Messemer with a seven-page summary of Success' purportedly fraudulent activities, as well as a "Data Fabrication Code" program that Success allegedly had used to fabricate missing data.  (Ex. 47 at 1; Ex. 48 at 1-3).  A subsequent email detailed the specific sales data that Sottile thought had been fabricated.  (See Ex. 54).

In mid-March, Nielsen used the Data Fabrication Code provided by Sottile to conduct an audit.  Nielsen concluded that there was "no evidence of widespread fabrication of data that is easily detectable," but that some of the Success data was "smoother than expected indicating [that] some imputation may be occurring (against [Nielsen's] requirement)."  (Ex. 43 at 1-2; ECF No. 142 (Affidavit of Christopher LeClair, sworn to on May 1, 2014 ("LeClair Aff. II)) ¶¶ 6-10).  Aside from this internal audit, Nielsen did not make any use of the information provided by Sottile.  (LeClair Aff. II ¶ 11).

D.      Post-Termination Contact With Stores

Following Success' notice of termination, Nielsen initiated this lawsuit.
Thereafter on May 7, 2011, Judge Barbara S. Jones entered a stipulated injunction
intended to protect both Nielsen and Success from poaching.  (ECF No. 3 ("Stipulated
Injunction")).  Pursuant to the Stipulated Injunction, Nielsen was required to release the
Success Stores from their contracts with Nielsen and was prohibited from soliciting any
Success Stores.  Nielsen was, however, permitted to solicit any unaffiliated stores that had
been recruited to participate in the Automation Project so long as it did not interfere with
any contracts between those stores and Success.  (Id. at 2-3).  Success, in turn, was
required to release the Original Pool stores from their contracts with Success and was
prohibited from soliciting both Nielsen Stores and unaffiliated stores for a "period of one
year from the date of the respective individual [contract]."  (Id. at 2).

On May 16, 2011, Nielsen sent form letters to each of the 488 stores that
had been recruited to participate in the Automation Project.  The text of the letters varied
depending on the status of the store, but each letter included contact information for
Nielsen's Automation Project team.  (See LeClair Aff. Exs. 15-17).

Insofar as relevant, the letter to the Original Pool stores stated:

Nielsen is no longer using Success to help with the hardware
and software upgrade and/or installation and training.  In fact,
Nielsen has initiated a lawsuit against Success.

Success, as part of that lawsuit has agreed (1) not to solicit
you for a year for the purpose of seeking to have you report
data to a competitor of Nielsen for inclusion in an aggregated

15

> market research report and (2) to release you from your Web
> Services Agreement With Success."

(Id. Ex. 17).

> The letter to the Success Stores stated:
>
> We know you signed up for the [Automation Project] and
> signed a Web Services Agreement with Success and a Vendor
> Cooperation Agreement with Nielsen.  [A]s part of the lawsuit
> with Success, Nielsen is willing to release you, without any
> further obligations or restrictions, from your . . . Vendor
> Cooperation Agreement if you so choose.

(Id. Ex. 16).

> Finally, in its letter to the unaffiliated stores, Nielsen stated:
>
> Nielsen is no longer using Success to help with the hardware
> and software upgrade and/or installation and training.  In fact,
> Nielsen has initiated a lawsuit against Success.
>
> Success, as part of that lawsuit, has agreed not to solicit you
> for a year for the purpose of seeking to have you report data
> to a competitor of Nielsen for inclusion in an aggregated
> market research report.

(Id. Ex. 15).

Nielsen has not incorporated into its market research reports any data

transmitted by the ninety stores that Success automated during the Automation Project.

(Pl.'s 56.1 Stmt. ¶ 300).  Nielsen also has not included any Success Stores in its statistical

samples.  (Id. ¶¶ 302-07).

II.     Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact" based on supporting materials in the record.  Fed. R. Civ. P. 56.  A factual dispute is genuine if  "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A fact in dispute is material if it "might affect the outcome of the suit under the governing law."  Id.

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party.  Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)).  The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material.  See Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  Assessments of credibility, choosing between conflicting versions of events, and the weighing of evidence are matters for the jury, not for the Court.  Fischl v. Armitage, 128 F.3d 50, 55-56 (2d Cir. 1997).  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  Id. at 55.  Moreover, "[s]imply because the parties have cross-moved, and therefore have implicitly agreed that no material issues of fact exist, does not mean that the court must join in that agreement and grant judgment as

17

a matter of the law for one side or the other," if the Court concludes that material issues of fact nevertheless exist.  Aviall, Inc. v. Ryder Sys., Inc., 913 F. Supp. 826, 828 (S.D.N.Y. 1996), aff'd, 110 F.3d 892 (2d Cir. 1997) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)).

To defeat a motion for summary judgment, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.

III.     Discussion

A.       Nielsen's Claims

1.       Breach of the GSA

At the heart of this matter are the two parties' dueling breach of contract claims.  Both sides seek summary judgment on these claims, as well as summary judgment dismissing their adversary's competing claims.  (See Am. Compl. ¶¶ 90-94 (Count One); Countercls. ¶¶ 213-26 (Counterclaim Two); ECF No. 124 ("Pl.'s Mem.") at 4-6, 6-11; ECF No. 127 ("Def.'s Mem.") at 10-13, 19-20).

a.      Applicable Law[4]

Under New York law, "to prevail on a breach of contract claim . . . a

plaintiff must prove [i] a contract; [ii] performance of the contract by one party; [iii]

breach by the other party; and [iv] damages."  Williams v. Time Warner Inc., No. 09 Civ.

2962 (RJS), 2010 WL 846970, at *6 (S.D.N.Y. Mar. 6, 2010) (quoting Terwilliger v.

Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000)).  "[I]t is beyond cavil that the failure of

a party to perform its obligations under a valid and binding contract constitutes a breach

and entitles the other contractually bound party to damages which arose out of the

breach."  Ez-Tixz, Inc. v. Hit-Tix, 969 F. Supp. 220, 225 (S.D.N.Y. 1997) (quoting

Custom Imports, Inc. v. Hanmee Trading Co., Inc., 596 F. Supp. 1126, 1130

(S.D.N.Y.1984)).

Initially, the Court must inquire "whether the contract is unambiguous with

respect to the question disputed by the parties."  Int'l Multifoods Corp. v. Commercial

Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002).  "A contractual term is ambiguous where

it may be ascribed 'conflicting reasonable interpretations.'"  Rogath v. Siebenmann,  129

F.3d 261, 267 (2d Cir. 1997) (quoting Mellon Bank, N.A. v. United Bank Corp. of N.Y.,

31 F.3d 113, 116 (2d Cir. 1994)).

---

[4]       The GSA contains a choice of law provision stating that New York law governs
the contract.  (See GSA § 12.10).  Moreover, both Nielsen and Success rely exclusively on New
York law.  Accordingly, the Court will apply New York substantive law in this diversity case.
See, e.g., Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (when the
parties' briefings assume New York law controls, "such 'implied consent . . . is sufficient to
establish choice of law.'") (quoting Tehran-Berkeley Civil & Environmental Engineers v.
Tippets-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

Whether the contract is clear or ambiguous is an issue for the Court to decide.  Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000).  "[W]hen a contract is ambiguous, its interpretation becomes a question of fact" and summary judgment is thus generally inappropriate.  Mellon Bank N.A., 31 F.3d at 116.  To avoid summary judgment, however, the nonmovant must adduce some relevant extrinsic evidence regarding its actual intent.  Id.

   b. Application of Law to Facts

Nielsen contends that it is entitled to summary judgment with respect to its claim that Success breached the GSA, as well as Success' parallel counterclaim, because it is undisputed that Success had not successfully automated 1,222 stores, as initially required by the GSA, by the time Success terminated the GSA on April 26, 2011.  (See Am. Compl. ¶¶ 93(a); Countercls. ¶¶ 154, 167; Pl.'s 56.1 Stmt. ¶ 278).[5]  In its opposition papers, Success contends that it was Nielsen that breached the GSA, "immediately upon execution," by demanding that Success exhaust each store in the Original Pool before recruiting any other stores for the Automation Project.  Success contends that this requirement "amounted to a material change to the GSA," which frustrated Success' performance by "significantly impact[ing] the cost[] and time" of performance.  (ECF

---

   [5] In its Amended Complaint Nielsen identifies additional alleged breaches of the GSA.  (See Am. Compl. ¶ 93(b)-(j)).  Its summary judgment motion focuses, however, exclusively on Success' failure to meet the GSA's store recruitment objectives.  (See Pl.'s Mem. 4-6).

No. 133 ("Def.'s Opp.") at 7; see Def.'s Mem. at 11-13, 19-20).  Success further contends

that, because Nielsen's "exhaustion" request constituted a significant modification of the

GSA, Nielsen violated Section 2.2 of the GSA by failing to provide Success with an

equitable adjustment to account for its impact on Success' performance.  (Def.'s Mem. at

11-13).

   In their briefs, both sides devote considerable attention to Section 2.2 of the

GSA.  (See Pl.'s Mem. at 6-11; Def.'s Mem. at 11-13).  That provision authorized

Nielsen to make changes to the SOW, "including . . . changes in the method or manner of

performance," but required Nielsen to provide a corresponding "equitable adjustment,"

and to modify the SOW accordingly, "[i]f the change in the scope of [s]ervices

significantly increase[d] or decrease[d] the cost of or the time for performance."  (GSA

§ 2.2).  Nielsen maintains that Section 2.2 expressly authorized it to make unilateral

changes to the SOW.  In the alternative, Nielsen contends that an equitable adjustment

pursuant to Section 2.2 was not necessary because any modified requirements that it may

have imposed were not significant.  (Pl.'s Mem. at 6).  Success counters that the language

of Section 2.2 required Nielsen to provide it with an equitable adjustment and

corresponding amendment of the SOW after Nielsen imposed the exhaustion requirement.

(Def.'s Mem. at 11-12).

   Both Nielsen and Success assume that Section 2.2 of the GSA is an

enforceable provision, but that assumption is, in all likelihood, erroneous.  Equitable

adjustment provisions frequently are included in public contracts, which provide an

administrative process, subject to court review, through which contractors can seek to recover any unexpected costs caused by modifications to the scope of their work during a project. See, e.g., 41 U.S.C. § 7103(a); Affiliated Constr. Grp., Inc. v. United States, 115 Fed. Cl. 607, 611-12 (2014); Cunningham v. United States, 748 F.3d 1172, 1181 (Fed. Cir. 2014). When they are incorporated into private contracts, equitable adjustment provisions generally are paired with a mechanism to resolve disputed claims or a methodology to calculate the value of the change. See, e.g., Morales Elec. Contracting, Inc. v. Siemens Bldg. Techs., Inc., No. 09-CV-2743 (ADS) (ETB), 2012 WL 3779410, at *2 (E.D.N.Y. Aug. 30, 2012); Envirocon, Inc. v. Alcoa, Inc., No. 7:06-cv-0549, 2006 WL 2460640, at *2 (N.D.N.Y. Aug. 23, 2006).

          The Second Circuit has declined to enforce equitable adjustment provisions in private contracts that fail to specify how the value of the adjustment will be determined. See Mem'l Drive Consultants, Inc. v. Ony, Inc., 29 F. App'x 56, 58, 60-61 (2d Cir. 2002) (denying enforcement of a contract provision stating that upon the occurrence of certain contingencies the parties would "adjust th[e] compensation in an equitable manner to provide a rate of compensation to [plaintiff] equivalent to that contemplated herein," because this indefinite provision "necessitate[d] future negotiations between the parties as to [future compensation]"); cf. Envirocon, 2006 WL 2460640, at *2 (equitable adjustment provision enforceable in contract providing a methodology for calculating changes); Great Eastern Transport LLC v. Waste Management of Connecticut, Inc., 211 F. Supp. 2d 499, 505-06 (S.D.N.Y. 2002) (equitable adjustment provision

22

enforceable because the contracting parties had "previously acted upon it" and an "objective method" existed to calculate the adjustment amount).  Section 2.2 is a prime example of an equitable adjustment provision that is unenforceable.  It provides neither a means to calculate an adjustment nor a mechanism to resolve disputes as to whether an adjustment is warranted.  For this reason, neither side is entitled to summary judgment on the basis of this unenforceable contract language.

Notwithstanding the parties' ill-conceived focus on Section 2.2, the fundamental issue raised by their competing motions remains whether Nielsen's exhaustion requirement constituted an impermissible unilateral modification of a material term of the GSA.  See Fed. Ins. Co. v. Turner Constr. Co., 779 F. Supp. 2d 345, 354 (S.D.N.Y. 2011) ("Under general contract rules, an obligation may not be altered without the consent of the party who assumed the obligation.") (quoting Bier Pension Plan Trust v. Estate of Schneierson, 74 N.Y.2d 312, 315 (1989)).  Nielsen contends that its "initial insistence in early October 2010 that Success focus on the current pool of 1,222 manually-reporting stores was entirely consistent with Nielsen's stated objective in both its RFP and . . . SOW."  (Pl.'s Mem. at 7).  Success counters that "the decision to focus on [those stores] was a material modification of the agreement by Nielsen" which "derail[ed] Success' plan for costs and timing to complete the project."  (Def.'s Mem. at 20).  Even if the Court could resolve this dispute, and Section 2.2 were enforceable, the prevailing party still would not be entitled to summary judgment on its contract claim because the finder of fact would have to resolve whether Nielsen's purported

23

modification "significantly increased" the scope of services that Success was to provide pursuant to the SOW.  (See GSA § 2.2).

Since Section 2.2 is unenforceable, the key question is whether Nielsen anticipatorily breached the GSA by insisting on the exhaustion requirement.  See Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 523-24 (2d Cir. 1990) (quoting REA Express, Inc. v. Interway Corp., 538 F.2d 953, 955 (2d Cir.1976)) (Under New York law, a "plaintiff may recover for anticipatory breach if it can show [i] that the defendant insisted upon terms which are not contained in a contract, . . . and [ii] that the plaintiff was ready, willing, and able to perform its own obligations under the contract when performance was due.") (alterations and internal quotation marks in original omitted); see also Mount Vernon City Sch. Dist. v. Nova Cas. Co., 19 N.Y.3d 28, 35 (2012) (contractual obligation may not be modified "without the consent of the party who assumed the obligation").  As noted above, Nielsen's position with respect to this issue is that LeClair's instruction that the stores comprising the Original Pool and Farm System be "fully exhausted" before any additional stores were recruited, (Ex. 33 at 1), was consistent with the SOW.  (Pl.'s Mem. at 7).  Success' conflicting view is that LeClair's demand dramatically altered its store recruitment strategy, which was developed on the assumption that other stores could be pursued in parallel with the Original Pool and Farm System stores.  (See Moran Aff. Ex. 1 at 2-15 ("Tarlow Dep. II") at 109).

Success' role, as defined by the SOW, was to "provide [s]tore conversions from existing platforms to automated, scanning platforms."  (SOW at 1).  As noted

24

previously, the SOW identified three universes of stores: "Existing Stores," "New Stores," and the "Farm System." (Id.). Success had four broad obligations which were to: (i) "[p]rovide weekly electronic sales data for a minimum of 1,222 [s]tores;" (ii) "[c]onvert convenience stores with the technical and physical means to enable the weekly electronic data file feed;" (iii) "collect executed [t]hird [p]arty [l]etters;" and (iv) "[p]rovide [d]ata [f]eeds and [m]anage [s]tore [a]ttrition." (Id. at 1-2). The second objective was further broken down into more detailed requirements. Thus, the SOW provided that Success was to automate the Existing Stores, or preapproved Success Stores, " if applicable," as well as the stores "currently cooperating within Nielsen's manual inventory audit program," a reference to the Original Pool stores – also "if applicable." (Id. at 2). Additionally, Success was required to "[i]mplement New Stores within the defined segment parameters and geographical dispersement [sic]," after gaining approval from Nielsen that a particular New Store met Nielsen's parameters. (Id.).

While the SOW clearly distinguishes among different categories of stores from which Success could recruit to fill one of the 1,222 slots of the Automation Project, it fails to describe unambiguously the degree of priority to be accorded to a particular type of store. For example, Success was instructed both to convert Existing Stores, as well as the Original Pool stores, "if applicable," and to "[i]mplement New Stores within the defined segment parameters and geographical dispersement [sic]." (Id.). Based on these instructions, it is unclear how much effort Success was required to exert to convince

a store in the Original Pool to automate.  Indeed, the SOW merely instructs Success to

automate the Original Pool stores "if applicable."  It does not describe the circumstances

that would make that requirement inapplicable.  Equally importantly, although the SOW

did not identify any specific stores other than Success' Existing Stores, Original Pool

stores, and the Farm System stores, the inclusion of New Stores as a category suggests

that the SOW contemplated recruitment efforts geared toward stores outside these three

categories of stores.

       Nielsen has raised the belated argument that the category of New Stores

was comprised exclusively of the Original Pool stores, and therefore was not an indicator

that the parties contemplated the recruitment of stores outside the Existing Stores,

Original Pool stores, and Farm System stores.  (See ECF No. 169 (Letter to the Court

from Brian E. Moran, Esq., dated July 6, 2015) at 2).  Nielsen's argument appears to be

based on the fact that the New Stores were defined, in part, as those "selected by

Nielsen."  (Id.).  According to Nielsen, "[t]he stores 'selected by Nielsen' were . . . the

1,222 manually-reporting stores from Nielsen's Historical Pool," the names of which

were identified on a list provided by Nielsen to Success around the time the GSA was

executed.  (Id.; see SOW at 6 (listing one of Nielsen's obligations under the GSA as

"provid[ing] current, complete and accurate information" on the Original Pool stores).

This interpretation of the contractual language fails for at least two reasons.  First, if the

New Stores and Original Pool stores were the same, there would have been no reason to

instruct Success both to convert the Original Pool stores "if applicable," and to

"[i]mplement New Stores."  (SOW at 2).  Second, if the New Stores were simply the

Original Pool stores, there would have been no reason for the SOW to describe a process

by which Success was obligated to "[g]ain approval from Nielsen" prior to automating a

New Store.  (See id. at 2, 6).  Although it appears that Nielsen's position has some

support, insofar as there is evidence that the term "New Stores" was also used to describe

the Original Pool and Farm System stores, (see id. Attachment 1), the contours of the

New Store category are at best ambiguous.  Indeed, at least in part because of this

ambiguity, the parties had sharp disagreements in late 2010 regarding the SOW's

requirements.  (See, e.g., Exs. 22-23, 33-35, 40).

        In these circumstances, a reasonable factfinder could determine that Success

was obligated under the SOW to make every effort to automate an Original Pool or Farm

System store prior to recruiting any alternative store.  A factfinder could also determine,

however, that the SOW permitted a less linear approach, in which Success had the

obligation to contact Original Pool and Farm System stores before reaching out to other

stores, but did not have to refrain from contacting alternative stores to fill unclaimed slots

after its initial contact with an Original Pool or Farm System store had proved

unsuccessful.

        In short, the SOW is ambiguous.  When a contractual provision "is

ambiguous, 'summary judgment may be granted only if the ambiguities may be resolved

through extrinsic evidence that is itself capable of only one interpretation, or where there

is no extrinsic evidence that would support a resolution of these ambiguities in favor of

27

the nonmoving party's case.'" CP III Rincon Towers, Inc. v. Cohen, No. 10 Civ. 4638

(DAB), 2014 WL 1357323 (S.D.N.Y. 2014) (quoting Topps Co. Inc. v. Cadbury Stani

S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008)).  Here, there is extrinsic evidence to support

both sides' interpretations of the SOW.  For example, a series of emails between Taylor

and LeClair suggests that Nielsen did not, in fact, anticipate an exhaustion requirement

when the GSA was signed.  Specifically, Taylor contacted LeClair to ascertain the reason

that LeClair had insisted (in an email) that six calls be placed to each Original Pool and

Farm System store before a New Store was contacted.  In his emails, Taylor noted that he

"honestly d[id not] recall [Nielsen's] position on this to be so stringent," and inquired

about the purpose of "exhaust[ing] all of our 6,000 stores before bringing others on."

(Ex. 29 at 1; Ex. 33 at 1).  Taylor further conceded during his deposition that while

Nielsen had "communicated the priority" of automating the stores on "Nielsen's primary

list . . . before calling other stores," it had not informed Success explicitly during the

vendor selection process that the exhaustion of those stores was compulsory.  (Taylor

Dep. at 73-74).

            On the other hand, LeClair testified that he had informed Success of the

exhaustion requirement during the RFP process.  (Moran Aff. Ex. 5a ("LeClair Dep. II")

at 36-37; Pl.'s 56.1 Stmt. ¶¶ 64-65 (During a meeting with Success on September 1, 2010,

"Nielsen emphasized both the importance of converting the current 1,222 manually-

reporting stores and the Automation Project's three-month timeline.").  The contract that

Success executed with Answernet, the telemarketing company retained to help Success

28

fulfill its obligations under the GSA, also notes that the "primary objective" of the GSA was to convert the Original Pool stores from "manual inventory audit to quality scanned inventory," and identifies Nielsen's "target market" as the stores that already were part of Nielsen's statistical sample at that time.  (AnswerNet Contract at 150499).[6]

There thus is a genuine issue of material fact as to whether Nielsen materially modified the GSA by insisting that each store in the Original Pool and Farm System be fully exhausted before an alternative store could be recruited.  Furthermore, even if Nielsen's actions constituted a material modification, to recover on its contract claim, Success still must show that it was "ready, willing and able" to perform its own original obligations under the GSA.  United States v. 0.35 of an Acre of Land, More or Less, Situated in Westchester Cnty, 706 F. Supp. 1064, 1074 (S.D.N.Y. 1988) (plaintiff must show that "defendant would have received what defendant had contracted for from plaintiff had defendant performed.") (quoting Kotcher v. Edelblute, 250 N.Y. 178, 183 (1928)).  Alternatively, Nielsen could prevail by proving that Success had agreed to renegotiate the terms of the GSA, or waived Nielsen's alleged repudiation, by accepting certain further benefits that Nielsen provided.  (See LeClair Aff. ¶¶ 113-14, 121-24, 132; Pl.'s Mem. at 8-9).  At this stage, however, these issues are not ripe for summary judgment.

---

[6]     Additionally, although Sottile was reluctant to speak on behalf of Success during his deposition, he nevertheless acknowledged that it was understood "that [Nielsen] wanted . . . [and] certainly expected their stores to be done first."  (Moran Aff. Ex. 2 ("Sottile Dep.") at 153-54).

C.    Success' Damages

Nielsen also argues that it is, at a minimum, entitled to partial summary

judgment with respect to the issue of damages on Success' breach of contract claim.

(Pl.'s Mem. at 11-13).  Nielsen seeks this relief on the theory that any recovery of

Success' lost profits itemized in the expert report of Michael R. Blezard, (Moran Aff. Ex.

29 ("Blezard Report")), is precluded by a limitation of liability clause in the GSA.  (See

GSA § 8.1).  Nielsen's argument is not persuasive.

Section 8.1 of the GSA provides that "neither party shall be liable to the

other party for special, incidental, consequential, indirect, punitive or exemplary damages

including but not limited to . . . lost profits."  (GSA § 8.1).  Despite this language, the

Blezard Report calculates "lost profit" damages in the amount of approximately $18

million allegedly resulting from Nielsen's breach of the GSA.  (Blezard Report at 4).[7]

According to the Blezard Report, approximately $2 million of this sum is attributable to

the profits Success would have earned by automating 1,222 stores, approximately $9

million is attributable to the profits Success would have earned by maintaining the 1,222

stores during the original term of the GSA, and approximately $7 million is attributable to

the profits Success would have earned had the GSA been extended for an additional five

years.  (Blezard Report at 3-7, Exs. 1-3).

_____

[7]    The Blezard Report also assigns a value of approximately $5.8 million to the damages Success suffered as a result of Nielsen's alleged tortious interference with Success' contracts with the Success Stores in violation of the Stipulated Injunction.  (Blezard Report at 7).

30

Nielsen is correct that these damages are "lost profits."  (Pl.'s Mem. at 11).

Indeed the Blezard Report characterizes them that way.  (See Blezard Report at 3-7).

There is, however, a distinction between lost profits that are "direct" or "general"

damages and those that constitute consequential damages.  See, e.g., Tractebel Energy

Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 109 (2d Cir. 2007) ("[W]hen the non-

breaching party seeks only to recover money that the breaching party agreed to pay under

the contract, the damages sought are general damages.").  As the Second Circuit observed

in Tractebel, general damages may technically qualify as lost profits, because "had the

contract been performed, the non-breaching party would have profited to the extent that

his cost of performance was less than the total value of the breaching party's promised

payments."  Tractebel Energy Mktg., 487 F.3d at 109; see Biotronik A.G. v. Conor

Medsystems Ireland, Ltd., 22 N.Y.3d 799, 805 (2014) ("[D]amages must be evaluated

within the context of the agreement, and . . . under the parties' [agreement], the lost

profits constitute general, not consequential, damages.").  As the New York Court of

Appeals explained in Biotronik A.G., the operative difference between the two forms of

lost profits "is whether the lost profits flowed directly from the contract itself or were,

instead, the result of a separate agreement with a nonparty."  Biotronik A.G., 22 N.Y.3d

at 808 (collecting cases).

Under New York law, even though no third party was involved, the

approximately $7 million in damages that the Blezard Report attributes to the profits

Success would have earned had the GSA been extended constitute "speculative profits on

[a] collateral transaction[].”  Tractebel Energy Mktg., Inc., 487 F.3d at 110.  Therefore they are consequential damages that cannot be recovered.  On the other hand, the approximately $11 million in lost profits that the Blezard Report calculates Success would have received by automating and maintaining 1,222 stores during the original term of the GSA are general damages because they are profits directly related to payments Nielsen agreed to make under the GSA, the loss of which would be the “natural and probable consequence” of Nielsen’s alleged breach.  Kenford Co. v. Cnty. of Erie, 73 N.Y.2d 312, 319 (1989).

        Section 8.1, of the GSA exculpates the parties from liability for “special, incidental, consequential, indirect, punitive or exemplary damages including but not limited to . . . lost profits.”  (GSA § 8.1) (emphasis added).  The term “lost profits” as it is used here, clearly refers to an example of losses that fall within the six categories of damages expressly excluded by the GSA.  These categories, in turn, clearly refer to damages beyond those flowing directly from the GSA.  See In re Indesco Int’l, Inc., 451 B.R. 274, 316 (Bankr. S.D.N.Y. 2011) (“Under the doctrine noscitur a sociis, ‘a word is known by the company it keeps.’”).  Despite the Blezard Report’s description of these losses as “lost profits,” they do not fall into any of the six excluded categories of damages.  Accordingly, those losses constitute general damages which are not limited by Section 8.1.  See id. at 315-16.  At trial, of course, Nielsen may challenge the Blezard

Report's calculations, and Success still must demonstrate that but for Nielsen's actions, it

would have automated the 1,222 stores.  See id. at 316-17.[8]

>2.   Breach of the Cooperation Agreement

Next, Nielsen alleges that Success breached the Cooperation Agreement by

"recreat[ing] and transmi[tting] . . . missing data to Nielsen without informing Nielsen of

its actions."  (Am. Compl. ¶ 98).  Success contends that it is entitled to summary

judgment with respect to this claim because "recreating data is expected, necessary to fill

in gaps, and widely accepted in the normal course of any data providing service."  (Def.'s

Mem. at 13).  Success further posits that Nielsen was aware of its practice of recreating

data and had acknowledged on multiple occasions that the data that Success was

providing was acceptable.  (Id. at 13-14).  On these bases, Success also seeks summary

judgment on its corresponding counterclaim, (Countercls. ¶¶ 206-12), which alleges that

Nielsen breached the Cooperation Agreement by terminating Success prematurely on

September 7, 2011.  (Def.'s Mem. at 17-19).

---

[8]       The cases cited by Nielsen to support its lost profits argument are inapposite.  In
all but one, the lost profits sought were not derived directly from the underlying contract, but
rather were traceable to a collateral contract executed with a third party.  See, e.g., (ECF 143
("Pl.'s Reply") at 4-5) (citing Carr v. Wal-Mart Stores, Inc., No. 10-CV-6176 (CJS), 2011 WL
939168, at *6 (W.D.N.Y. March 16, 2011); Great Earth International Franchising Corp. v. Milks
Development, 311 F. Supp. 2d 419 (S.D.N.Y. 2004); EPN Ingenieria S.A. v. General Electric
Co., No. 92 Civ. 1563 (KMW), 1996 WL 531867 (S.D.N.Y. Sept 19, 1996)).  In the fourth case,
Royal Dispatch v. UBS Financial Services, Inc., No. 12-CV-2032 (JG), 2013 WL 3968757
(E.D.N.Y. July 31, 2013), Judge Gleeson did not have to decide whether the limitation provision
precluded both general and consequential lost profits.  Id. at *9 n.14.

The Cooperation Agreement provides, in part, that Success will "collect and deliver to Nielsen" scanned data from its affiliated stores "in the format described in Appendix A-1," "[f]or an initial period of three year[s] beginning [February 15, 2009,] and year-to-year thereafter until canceled by either party at any time upon thirty days prior written notice." (Cooperation Agreement at 1).  Appendix A-1 identifies various elements that the scanned data must contain, including product UPC codes and descriptions.  (Id. at Appendix A-1).  Appendix A-2 sets forth Nielsen's "Payment Deduction Policy."  Listed among the errors that would result in payment deductions are missing, incomplete, duplicated, and late data.  (Id. at Appendix A-2).

By letter dated September 7, 2011, Nielsen provided notice that it was terminating the Cooperation Agreement.  (Ex. 12).  In that letter, as well as in its opposition papers, Nielsen asserts that the Cooperation Agreement allowed either party to terminate the Cooperation Agreement at any time upon thirty days' written notice.  (ECF No. 140 ("Pl.'s Opp.") at 12).  The Cooperation Agreement, however, plainly manifests the parties' intention to be bound for a period of at least three years – through February 2012 – after which the agreement would automatically be renewed on a yearly basis unless canceled by either party.  (See Cooperation Agreement at 1).  Accordingly, there is no basis for Nielsen's contention that the Cooperation Agreement was terminable at will within the initial three-year period.[9]

_____

[9]      The Cooperation Agreement arguably is ambiguous as to the parties' intent regarding termination after the third year.  Specifically, it is unclear whether either contracting

(continued...)

Nielsen has adduced evidence, however, that Success manipulated the data it was transmitting to Nielsen under the Cooperation Agreement in order to enhance its chances of being selected by Nielsen as the contractor for the GSA.  (Moran Aff. II Ex. 1 ("Sottile Dep. II") at 43-44).  Indeed, Success does not expressly deny that it manipulated the data that it provided to Nielsen, contending instead that "recreating data is expected, necessary to fill in gaps, and widely accepted in the normal course of any data providing service."  (Def.'s Mem. at 13).  As support for this proposition, Success cites the deposition testimony of Cuminale, Nielsen's Chief Legal Officer, who indicated that it would have been appropriate for <u>Nielsen</u> to "fill in blanks in its data sample set."  (Ex. 24 at 79).  Success may ultimately be able to prove that data manipulation is an acceptable practice in the industry, but Cuminale's testimony suggests that Nielsen may have expected Success to provide raw, unmanipulated data consistent with the requirements of Appendices A-1 and A-2, after which Nielsen's own statisticians would determine whether, and, if necessary, to what extent it would "smooth" that data.

Success also contends that Nielsen was aware that Success was recreating data because Success stated in the GSA Proposal that it would review the scanned data for "consistency and validity" to "ensure accuracy," (Def.'s Mem. at 13), and because Nielsen previously had approved the accuracy of the data being provided by Success,

---

[9](...continued)
party could terminate the Agreement on thirty days' notice after an additional year had begun. Inasmuch as Nielsen terminated the Cooperation Agreement during the initial three-year term, the Court need not address this issue.

(id.).  It is not apparent from either the language of the Proposal, which was drafted more than a year after the Cooperation Agreement was executed, or from Nielsen's own review of the data, whether Nielsen understood that Success was manipulating the data and approved of that practice, or whether Success' practice potentially constituted a breach of the Cooperation Agreement.  Indeed, the very internal Nielsen communications that Success cites to support its argument suggest that Nielsen was concerned about duplicated and highly smoothed data, (Ex. 28), and had discovered some evidence that Success' data was "smoother than expected," (Ex. 43; see also LeClair Aff. II ¶ 18 ("Success was not authorized by Nielsen under the GSA or otherwise to do any 'smoothing' of store data or any imputing of data that was either missing shifts or UPC items.")).

In sum, a genuine issue of fact exists as to whether Success breached the Cooperation Agreement by providing Nielsen with data that failed to conform to the requirements of the Cooperation Agreement, thereby relieving Nielsen of its own obligation to perform.  See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach.").  Accordingly, Success is not entitled to summary judgment with respect to any alleged breach of the Cooperation Agreement.

3.      Fraud and Misrepresentation by Success

Nielsen's third claim for relief alleges that Success made multiple

fraudulent representations during the negotiation and performance of the GSA –

including statements during the RFP process regarding the status of its efforts to develop

certain software applications necessary to complete the Automation Project, and

statements in December 2010 concerning its ability to complete the conversion project by

March 2011.   (Am. Compl. ¶¶ 100-11).[10]   Success has moved for summary judgment

dismissing this claim, arguing first that the representations were true, and second that

Nielsen has failed to demonstrate reasonable reliance on them.   (Def.'s Mem. at 16-17).

That motion is granted in part.

To state a claim for common law fraud in New York, a plaintiff must show

that "[a] the defendant made a material false representation, [b] the defendant intended to

defraud the plaintiff thereby, [c] the plaintiff reasonably relied upon the representation,

and [d] the plaintiff suffered damage as a result of such reliance."  Banque Arabe et

Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995).

Since New York law imposes a heightened standard of proof on a fraud claim, the issue

before the Court at the summary judgment stage is whether "'the evidence on the record

could support a reasonable jury finding that the [plaintiff] has shown each element' of a

fraud claim 'by clear and convincing evidence.'"  Northern Shipping I, L.L.C. v, Icon

_____

[10]      On June 17, 2014, the parties stipulated to the voluntary dismissal of Nielsen's
fraud claim against Tarlow and Novick.  (ECF No. 151).

Capital Corp., 998 F. Supp. 2d 301, 318 (S.D.N.Y. 2014) (quoting Abu Dhabi

Commercial Bank v. Morgan Stanley & Co., 888 F. Supp. 2d 478, 484 (S.D.N.Y. 2012)).

                  Nielsen has presented evidence sufficient to allow a reasonable factfinder to

conclude by clear and convincing evidence that, contrary to Success' representations, the

requisite software applications were not fully developed and ready for deployment by the

time the GSA was executed, and that Nielsen had relied upon Success' misrepresentations

in the course of selecting Success as the vendor for the Automation Project.  In that

regard, it apparently is undisputed that Success made the representations at issue, (see

LeClair Aff. Ex. 2 at 17, 20), and that Nielsen relied on those representations, (LeClair

Aff. ¶ 27; see also LeClair Dep. II at 52-53).  Sottile further has testified that additional

work needed to be done to complete multiple software applications.  (Sottile Dep. at 74-

81).[11]  Internal Success documents also appear to confirm both the need for additional

software development, (Moran Aff. Ex. 11 at 9-10), and the inadequacy of the existing

software, (id. Exs. 14, 16-17).  Indeed, Tarlow has expressly acknowledged that there was

a need to modify the existing software  further.  (Moran Aff. Ex. 1 at 50-55 ("Tarlow

Dep. III") at 34-38).  Although Success ultimately may be correct that the modifications

in question were "minor changes . . . limited to updating the user interface . . . [and] other

adjustments that would be required when applying the software to any new project,"

---

[11]      Success challenges, on multiple occasions, Nielsen's reliance on Sottile's
deposition testimony on the basis that Sottile was "an admitted perjurer" who was considered
unreliable by Nielsen.  (See, e.g., Def.'s Mem. at 9 n.3, 34).  At trial, Success may have the
opportunity to challenge Sottile's credibility by impeaching him with inconsistent prior
statements or by any other admissible means.  Nevertheless, at this stage, Sottile's testimony
clearly is evidence upon which Nielsen may rely to avoid summary judgment.

(ECF No. 146 ("Def.'s Reply") at 6), whether the software applications were ready to be deployed presents a question of fact that cannot be resolved at this stage of the litigation.

Turning to the assertion that Success committed fraud after the GSA was signed by misrepresenting its progress and anticipated completion date, "[a] fraud claim that merely alleges that 'intentionally false statements' were made by a party 'indicating his intent to perform under [a particular] contract' is duplicative of the underlying breach of contract claim . . . and must be dismissed as a matter of law."  Revonate Mfg., LLC v. Acer Am. Corp., No. 12 Civ. 6017 (KBF), 2013 WL 342922, at *3 (S.D.N.Y. Jan. 18, 2013) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13 (2d Cir. 1996)).  Here, that is all that this aspect of Nielsen's fraud claim alleges. Accordingly, Success is entitled to summary judgment with respect to Nielsen's fraud claim to the extent it is based on statements made by Success after the GSA was signed.

      B.      Remaining Success Counterclaims

            1.      Breach of Oral Amendment to GSA

 Success' third counterclaim alleges that Success and Nielsen agreed to several "oral" amendments to the GSA in December 2010, which were memorialized in emails and in internal Nielsen documents, and that Nielsen subsequently breached the amended GSA.  (Contercls. ¶¶ 227-32).  Both parties seek summary judgment with respect to this claim.

Nielsen is entitled to summary judgment on this claim because there is no admissible evidence that the parties agreed to a legally-binding oral or written amendment

of the GSA that Nielsen then breached.  See Gorodensky v. Mitsubishi Pulp Sales (MC) Inc., 92 F. Supp. 2d 249, 254 (S.D.N.Y. 2000) ("The question of whether a binding contract exists is one of law that is appropriately decided on a motion for summary judgment").  Indeed, considered as a whole, the emails that Success cites to advance its claim not only fail to manifest the parties' final agreement concerning a modification, but also fail to identify a single specific provision that was part of the alleged amendment. (See, e.g., Exs. 15, 18-21, 22-23, 35).

The GSA, of course, provided that it could only be amended through a writing signed by representatives of both Nielsen and Success.  (GSA § 12.6).  Here, even if that provision were not part of the GSA, or could otherwise be overcome, the parties' email exchanges do not establish the existence of modifications of the GSA – oral or otherwise – that Nielsen breached.  Admittedly, on October 26, 2010, in response to Tarlow's position that Nielsen's modifications "profoundly change[d] the scope, cost and retailer acceptance," LeClair indicated to Tarlow that Nielsen "will provided an updated agreement."  (Ex. 15 at 1).  He followed that statement, however, with the caveat that Nielsen had not "added any costs," and that an updated agreement thus would focus primarily on extending Success' time to perform.  (Id. at 1-2).  Two days later, LeClair similarly indicated a willingness to "work/change the SOW."  (Ex. 40 at 1).  Although Taylor and Tarlow subsequently discussed a potential amendment in December, they only identified potential areas that an amendment might address.  (Ex. 16 at 1-2).  Indeed, in a December 7 email, Tarlow noted that "[i]f Nielsen has the mind set to change this

40

agreement we have some points we would be happy to throw into the mix [i]ncluding but

not limited to a new blended cost formula."  (Id. at 2).  Thus, when Taylor indicated to

Tarlow in February 2011 that Nielsen would "quickly address" preparing an amendment

to reflect "changes  . . . made in December," that email correspondence neither suggested

that the parties had agreed to any modified or additional contractual terms nor reflected

any such terms that Nielsen subsequently breached.

        Accordingly, these email exchanges, at best give rise to an unenforceable

"agreement to agree."  (See Pl.'s Mem. at 15); KJ Roberts & Co. v. MDC Partners Inc.,

No. 12 Civ. 5779 (LGS), 2014 WL 1013828, at *9 (S.D.N.Y. Mar. 14, 2014) ("[I]t is

rightfully well settled in the common law of contracts in [New York] that a mere

agreement to agree, in which a material term is left for future negotiations, is

unenforceable.") (quoting Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52

N.Y.2d 105, 109 (1981)) (alterations in original).  Indeed, it is telling that Success is

unable to specify so much as a single provision of the amendment that Nielsen allegedly

breached.  (See Def.'s Mem. at 20-21; Def.'s Opp. at 11-13).  Contrary to Success'

suggestion, the parties' correspondence does not meet the threshold necessary to

constitute a "preliminary agreement."  See Adjustrite Sys. v. Gab Bus Servs., 145 F.3d

543, 548 (2d Cir. 1998) (an agreement constitutes a binding preliminary agreement "when

the parties agree on all the points that require negotiation (including whether to be bound)

but agree to memorialize their agreement in a more formal document").  Here, as

previously noted, there is no admissible evidence that the parties agreed to any terms of an enforceable amendment, let alone "all the points that require negotiation."  Id.

The fact that Nielsen drafted a Proposed Amendment yet chose not to provide it to Success does not change the outcome.  It is beyond cavil that Nielsen may not be compelled to comply with the terms of an internal document that was never shared with Success, much less executed by both parties.  See, e.g., Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 372 (2d Cir. 2003) (quoting Schurr v. Austin Galleries of Ill., 719 F.2d 571, 576 (2d Cir. 1983)) ("Under New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties . . . because an enforceable contract requires mutual assent to the essential terms and conditions thereof.").  Indeed, if anything, the failure to disclose the Proposed Agreement to Success suggests that while Nielsen was committed to making certain changes to the GSA, agreement on a specific set of terms had yet to be reached.  Accordingly, Nielsen is granted summary judgment with respect to Success' oral amendment counterclaim.

2.    Fraud and Misrepresentation by Nielsen

Success' fourth and fifth counterclaims for fraud and fraud in the inducement allege that Nielsen induced Success to enter into the GSA and continue performing by (a) failing to disclose during contract negotiations that the Original Pool had to be exhausted before Success could contact any alternative stores (Countercls. ¶¶ 248-56); (b) falsely representing that Nielsen intended to amend the GSA to reflect requested modifications and corresponding equitable adjustments (id. ¶¶ 234-36, 242-46,

42

257-62); and (c) failing to disclose to Success the Sottile correspondence (id. ¶¶ 237-241). In its motion papers Success also alleges that Nielsen induced Success to enter into the GSA by falsely representing that fifty to seventy percent of the Original Pool stores were interested in automating.  (Def.'s Mem. at 23-24).  Both parties seek summary judgment with respect to this claim.

Nielsen initially contends that each of Success' allegations of fraud are improperly duplicative of Success' breach of contract claim.  (Pl.'s Mem. at 16-17). Nielsen also argues that summary judgment is appropriate because Success cannot prove that it was damaged by any of Nielsen's purportedly wrongful actions, including the allegedly fraudulent representations and material omissions that underlie Success' fraud claims.  (Id. at 16; Pl.'s Opp. at 11 n.7).

In the course of briefing these claims, Success appears to have focused primarily on its allegation that Nielsen falsely represented, during contract negotiations, that fifty to seventy percent of the Original Pool stores were interested in automating. (Def.'s Opp. 13-17; Def.'s Reply at 11).  Even assuming this were so, Success' fraud claims would nevertheless be subject to summary judgment because it cannot prove that it sustained separate damages as a result of Nielsen's alleged fraud.

As a threshold matter, in New York "parallel fraud and contract claims may be brought if the plaintiff [a] demonstrates a legal duty separate from the duty to perform under the contract; [b] points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or [c] seeks special damages that are unrecoverable as contract

damages."  Merrill Lynch & Co., 500 F.3d at 183 (quoting Bridgestone/Firestone, 98 F.3d

at 20).  Furthermore, in New York, damages for fraud are subject to the "out-of-pocket

rule," which limits a plaintiff's damages to those sustained as the direct result of the

alleged fraud.  Lama Holding Co. v. Smith Barney, 88 N.Y.2d 413, 421 (1919)

("Damages are to be calculated to compensate plaintiffs for what they lost because of the

fraud, not to compensate them for what they might have gained.  Under the out-of-pocket

rule, there can be no recovery of profits which would have been realized in the absence of

fraud."); Solar Travel Corp. v. Nachtomi, No. 00 CIV 3564 (AGS), 2001 WL 641151, at

*5 (S.D.N.Y. June 8, 2001) ("[L]ost profits  . . . and [lost] business opportunities cannot

be recovered under a fraud theory under New York law."); see Bruce v. Martin, No. 87

CIV. 7737 (RWS), 1993 WL 148904, at *5 (S.D.N.Y. Apr. 30, 1993) (in order to prove

damages with respect to a fraudulent inducement cause of action, a plaintiff must assert

damages "stemming only from the fraudulent inducement," which are distinct from

damages sought for breach of the underlying contract).

        Success has alleged damages stemming from Nielsen's purportedly

fraudulent actions in the most conclusory fashion possible.  (See Def.'s Mem. at 22

("Success, to its detriment, reasonably relied on the false statements by Nielsen and it's

[sic] representatives."); Countercls. ¶¶ 246, 256 ("Success was damaged as a result of its

reliance on Nielsen's false representations in an amount to be determined at trial."); ¶ 262

(repeating the same statement but also alleging that "in the alternative Success is entitled

to rescission.")).  Despite these efforts to plead a fraud claim, it is apparent that the only

44

damages that Success plausibly has alleged are those that stem from Nielsen's alleged breach of the GSA.  For example, in response to Nielsen's argument that Success did not suffer any damages as a proximate cause of any actions by Nielsen alleged in the counterclaims, (see Pl.'s Opp. at 11 n.7), Success states only that it has suffered the damages set forth in the Blezard Report.  (Def.'s Reply at 7).  However, as Success admits, the damages articulated in the Blezard Report constitute "the benefit of the bargain if the [GSA] had been completed - no more, no less."  (Def.'s Opp. at 10).

A plaintiff seeking to recover the benefit of its bargain with the defendant must proceed with a breach of contract action – as Success has – not with an action for fraud.  In re Eugenia VI Venture Holdings, Ltd. Litig., 649 F. Supp. 2d 105, 122 (S.D.N.Y. 2008), aff'd, 370 F. App'x 197 (2d Cir. 2010).  Under New York's out-of-pocket damages rule regarding claims of fraud, damages must be limited to "the sum necessary to restore a party to the position it occupied before commission of the fraud."  Id.  Here, as Nielsen correctly observes, it is undisputed that any capital that Success committed to the Automation Project was advanced by Nielsen.  (See Pl.'s Opp. at 11 n.7; SOW at 8-9).  Therefore, the only damages that Success may have suffered are those attributable to lost profits under the GSA, which are not recoverable as part of a fraud claim.  Accordingly, Nielsen's motion for summary judgment dismissing Success' fourth and fifth counterclaims is granted, and Success' motion for summary judgment as to those counterclaims is denied.

### 3.      Claims Related to the Sottile Correspondence

#### a.      Good Faith and Fear Dealing

Success' eighth counterclaim alleges that Nielsen breached the GSA's implied covenant of good faith and fair dealing by (i) unilaterally making material modifications to the GSA; (ii) falsely representing to Success that it intended to provide an amendment to the GSA; and (iii) failing to disclose to Success its extensive communications with Sottile.  (Countercls. ¶¶ 283-300).  Both parties seek summary judgment with respect to this claim.

Every contract governed by New York law is subject to an implied duty of good faith and fair dealing.  Lebowitz v. Dow Jones & Co., 508 F. App'x 83, 84 (2d Cir. 2013); Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989).  This duty requires each contracting party "to refrain from 'do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Royal Dispatch Servs., Inc. v. UBS Fin. Servs., Inc., No. 12-CV-2032 (JG) (RLM), 2012 WL 3113291, at *4 (E.D.N.Y. July 31, 2012).  It may not however, be used to "create duties that negate explicit rights under a contract," or that are inconsistent with other contract terms.  LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc., 725 F.3d 184, 195-96 (2d Cir. 2013) (citing Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304 (1983)).  Moreover, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled."  Cordell v. McGraw-Hill

46

Companies, Inc., 525 F. App'x 22, 23 (2d Cir. 2013) (quoting Harris v. Provident Life &
Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002)).  Accordingly, "a claim for breach of
the implied covenant can be maintained in conjunction with a breach of contract claim
'only if the damages sought by the plaintiff[] for breach of the implied covenant are not
intrinsically tied to the damages allegedly resulting from breach of contract.'"  Ellington
Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 205 (S.D.N.Y.
2011).

        Success' claim that Nielsen breached the GSA's implied duty of good faith
and fair dealing by misrepresenting to Success that it would modify the GSA and through
its unilateral material modifications of the GSA clearly is duplicative of its breach of
contract claim as they both arise out of the same facts and seek the same damages.  See
id.  Accordingly, neither allegation provides a basis for a separate claim that Nielsen
breached its implied covenant of good faith and fair dealing.  If that separate claim is to
survive, Success therefore must show that the implied covenant was breached by
Nielsen's failure to notify it of the ongoing Sottile correspondence.

        The evidence with respect to Nielsen's dealings with Sottile is totally
benign.  As noted previously, in late December 2010, an anonymous individual, later
identified as Sottile, contacted Nielsen to report that an unnamed Nielsen contractor was
"faking data and submitting it to Nielsen as actual data."  (Ex. 50 at 3).  On February 16,
2011, the anonymous sender identified his employer as Success and indicated that he had
"information" for Nielsen.  (Ex. 37 at 4).  Despite some reluctance, Taylor, the recipient

of the February email, promised not to reveal the anonymous sender's identity to Success in exchange for securing further information.  (Id. at 2-4).  Subsequently, the anonymous sender revealed that Success was transmitting Nielsen seemingly "perfect" data from the stores participating in the Automation Project because it was fabricating missing data. (Id. at 1-2).  The anonymous sender also provided Nielsen with a "data fabrication code," which Success allegedly was using to fabricate the missing data, as well as a seven-page summary of Success' supposedly fraudulent activities.  (Exs. 47-48).

Although Success claims that Nielsen used the information provided by Sottile to "manipulate the situation," and "gain an unfair advantage in its dealings with Success," (Def.'s Opp. at 18), it has not presented a shred of evidence to substantiate that assertion.  Instead, Success focuses on what might have happened had Nielsen obtained Success' full software code.  Nielsen alleges, however, that it "never made use of any information, algorithms or code provided by the sender of the anonymous email apart from [an] internal audit of the data feeds conducted on or about March 11, 2011." (LeClair Supp. Aff. ¶ 11).  "For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff."  Fillmore East BS Finance Subsidiary LLC v. Capmark Bank, 552 F. App'x 13, 16 (2d Cir. 2014) (quoting Aventine Inv. Mgm't., Inc. v. Can. Imperial Bank of Commerce, 697 N.Y.S.2d 128, 130 (2d Dep't 1999)).  Here, a factfinder could not reasonably conclude that Nielsen's decision to conduct an internal

48

audit of a contractor alleged to have engaged in fraud somehow injured that contractor or

deprived it of the fruits of the underlying contract.  Likewise, it would make little sense to

require a party to a contract to disclose a fraud allegation to an alleged wrongdoer without

first attempting to ascertain internally whether the accusation is true.  See H.S.W.

Enterprises, Inc. v. Woo Lae Oak, Inc., 171 F. Supp. 2d 135, 141 (S.D.N.Y. 2001)

(quoting M/A-COM Security Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)) ("The

only circumstance whereby omission could constitute a breach of the covenant is where

the obligation to disclose the concealed information is 'so interwoven in the whole

writing of a contract as to be necessary for effectuation of the purposes of the contract.'").

In any event, even if disclosure were necessary, there is no evidence that Nielsen's failure

to comply by disclosing information about Sottile harmed Success in any way.

Success' only remaining argument regarding the damages it suffered

(asserted in connection with its aiding and abetting claim) is that Nielsen's participation

in the Sottile correspondence caused Nielsen not to negotiate in good faith to amend the

GSA.  (Def.'s Opp. at 24).  Thus, Success alleges that Nielsen "frustrat[ed] Success'

ability to obtain the bounty of the GSA" based upon its bad faith acceptance of Sottile's

accusations.  (Id.).  Success, however, fails to present any evidence to support this

allegation – and there is ample evidence to the contrary.  For example, the record

demonstrates that in March 2011, after Nielsen was in receipt of Sottile's information, the

parties engaged in active negotiations concerning Nielsen's proposed plan to scale back

Success' role in the Automation Project, with multiple offers and counteroffers being

49

exchanged without any hint or accusation of bad faith.  (See Moran Aff. Exs 12-14.).

Indeed, it is undisputed that it was Success – not Nielsen – that terminated the GSA,

citing Nielsen's failure to cure several purported breaches.  (Ex. 9).  In these

circumstances, Success' conclusory assertions regarding Nielsen's lack of good faith do

not suffice to make out a claim.

Accordingly, Nielsen's motion for summary judgment dismissing Success'

breach of the implied covenant of good faith and fair dealing claim is granted, and

Success' corresponding motion is denied.

b.    Aiding and Abetting Breach of Fiduciary Duty

For substantially similar reasons Nielsen is also entitled to summary

judgment with respect to Success' thirteenth counterclaim, which alleges that Nielsen

aided and abetted Sottile's breach of his fiduciary duty.  (Countercls. ¶¶ 330-46).  In

support of this aspect of its motion, Nielsen argues that Success is unable to identify any

damages proximately caused by the conduct that allegedly aided and abetted Sottile's

breach of his fiduciary duty to Success.  (Pl.'s Mem. at 29-30).  Success counters that

Nielsen's actions, including "offering [Sottile] protection, and both receiving and

requesting from him Success' confidential and proprietary information, surely affected

the performance of the parties pursuant to their obligations under the GSA."  (Def.'s Opp.

at 23) (emphasis added).  Success also alleges that Nielsen's failure to negotiate in "good

faith" regarding an amendment to reflect its modifications of the GSA was "certainly

based, at least in part, if not entirely, on the false information that it was receiving from

Sottile." (Id. at 24) (emphasis added).  Success fails, however, to support these

conclusions with any admissible evidence that could enable a factfinder to so infer.

   Under New York law, a claim of aiding and abetting a breach of a fiduciary

duty requires proof of damages stemming from the underlying breach of fiduciary duty as

an essential element of the claim.  See In re Sharp, 403 F.3d 43, 49–50 (2d Cir. 2005)

(quoting Kaufman v. Cohen, 760 N.Y.S.2d 157, 169 (1st Dep't 2003)); BBS Norwalk

One, Inc. v. Raccolta, 60 F. Supp. 2d 123, 130 n.2 (S.D.N.Y. 1999).  For the reasons

noted in the preceding section, even assuming that Sottile breached his fiduciary duty to

Success by communicating with Nielsen and providing a copy of the data fabrication

code, and that Nielsen's guarantee of anonymity gave rise to aiding and abetting liability,

Success has failed to produce evidence from which a reasonable factfinder could

conclude that Success suffered damages as a result of Sottile's breach.  See Britestarr

Homes, Inc. v. Piper Rudnick LLP, 453 F. Supp. 2d 521, 528 (D. Conn. 2006), aff'd, 256

F. App'x 413 (2d Cir. 2007).  Accordingly, Nielsen's motion for summary judgment

dismissing this claim is granted, and Success' cross-motion is denied.

    4. Claims Related to the Stipulated Injunction

     a. Tortious Interference With Contract

   Success' ninth counterclaim alleges that Nielsen tortiously induced

numerous Success Stores to breach their contracts with Success by sending them a letter

in May 2011 in contravention of the Stipulated Injunction.  (Countercls. ¶¶ 301-09).

Success and Nielsen both seek summary judgment with respect to this claim.

In New York, to state a claim of tortious interference with contract a plaintiff must establish "[i] the existence of a valid contract between the plaintiff and a third party; [ii] the defendant's knowledge of the contract; [iii] the defendant's intentional procurement of the third-party's breach of the contract without justification; [iv] actual breach of the contract; and [v] damages resulting therefrom." CAC Grp. Inc. v. Maxim Grp. LLC, 523 F. App'x 802, 806 (2d Cir. 2013) (quoting Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006)) (internal quotation marks omitted).

Pursuant to the Stipulated Injunction, Nielsen was required to release the Success Stores from their contracts with Nielsen and was expressly prohibited from soliciting any Success Stores.  (Stipulated Injunction at 2-3).  Nielsen's letter to the Success Stores stated that Nielsen was "willing to release [the Success Stores]" from their contracts with Nielsen, "without any further obligations or restrictions . . . if [they] so [chose]."  (LeClair Aff. Ex. 16).  According to Success, this text violated the Stipulated Injunction by "giving the stores an 'option' to be released" and by failing to alert them to the existence of the Stipulated Injunction.  (Def.'s Mem. at 26-27).  Success suggests further that the May 2011 Letter "had the desired effect of persuading the stores to terminate their relationship with Success."  (Id. at 27).[12]

---

[12]    In its papers, Nielsen addresses the merits of this claim with respect to both the Success Stores as well as a different letter mailed to unaffiliated stores.  (See Pl.'s Mem. at 22-26; LeClair Aff. Exs. 15-16).  Success' papers make clear, however, that this claim relates solely to the contracts between Success and the Success Stores.  (See Def.'s Mem. at 26-27; Def.'s Opp. at 19-20).

Nielsen argues that it is entitled to summary judgment dismissing this counterclaim because Success has failed to present any evidence that so much as a single Success Store actually breached its contract with Success, let alone that Nielsen engaged in any intentional tortious acts that constituted a "but for" cause of that breach.  (Pl.'s Mem. at 23).  Even if the Court were to assume that certain Success Stores did terminate their relationship with Success after this lawsuit was initiated by Nielsen, Nielsen nevertheless would be entitled to summary judgment on this claim.

Nielsen first contends that the contracts between Success and the Success Stores allowed either party to terminate the agreement "at any time" without notice. Since these contracts purportedly were terminable at will, Nielsen posits that the termination of a Success Store's relationship with Success could not constitute a breach of contract.  (Pl.'s Mem. at 23 (citing Moran Aff. Ex. 30 ¶ 20)).   Success responds that the contracts at issue were not, in fact, terminable at will because they were year-to-year agreements terminable only upon notice after the initial one-year term expired.  (Def.'s Opp. at 20 (citing Ex. GG)).  The only conceivable basis for that claim is language describing the fee for the software being licensed to the stores by Success as "$69.95 per month based on an [] annual subscription."  (Ex. GG at 1).  However, the termination provision of the Success contract states that "[t]he user may terminate this Agreement at anytime [sic] by ceasing to make payments and notifying [Success] in writing."  (Moran Aff. Ex. 30 ¶ 20; Ex. GG ¶ 20).  This termination provision could not be clearer.  Because a Success Store could terminate this contract at any time, it was as a matter of law

terminable at will.  Accordingly, Success cannot establish the "breach" element of its tortious interference claim.  AIM Int'l Trading, L.L.C. v. Valcucine S.p.A., No. 02 Civ. 1363 (PKL), 2003 WL 21203503, at *5 (S.D.N.Y. May 22, 2003) ("A contract terminable at will cannot be the basis for a tortious interference with contract claim.").[13]

Success also has failed to present any evidence that Nielsen's letter constituted a tortious attempt to have the Success Stores breach their contracts with Success.   When the allegedly interfering party "has an 'economic interest' in an entity and interferes with an existing contractual relationship between the plaintiff and that entity, such interference is considered privileged and the plaintiff must show malice or illegality in order to establish a tortious interference claim."  White Plains Coat & Apron Co. v. Cintas Corp., 460 F.3d 281, 283 (2d Cir. 2006) (citing Foster v. Churchill, 87 N.Y.2d 744, 750-51 (1996)).  Nielsen had a clear economic interest in the Success Stores involved in its Automation Project.  Indeed, when Success first accused Nielsen of violating the Stipulated Injunction in 2011, Nielsen explained to Judge Jones that the purpose of the 2011 letters was to put the stores involved in the Automation Project on notice of developments in this lawsuit in order to "avoid . . . being accused of being in breach" of the contracts that had been entered into between Nielsen and those stores. (ECF No. 20 at 8).

---

[13]     Appealing to public policy concerns, Success complains that this reading of New York law would "essentially permit a party to interfere with the contract of two other parties, and, so long as the contracting parties were free to terminate at any time, a plaintiff could never sustain a cause of action for tortious interference with contract."  (Def.'s Opp. at 19).  This, of course, is precisely what the case law provides:  it is the breach of a contract that substantiates a tortious interference with contract claim, not the lawful termination of a contractual relationship.

Success' claim is premised on Nielsen's statement that it was "willing to release" the Success Stores, which failed to acknowledge that the Stipulated Injunction required Nielsen to do so.  As Judge Jones observed, it would have been more accurate to state that the stores were being "released without any further obligations," (id. at 11), rather than creating the impression that the stores had an option.  However, any ambiguity in Nielsen's statement does not amount to the malice or illegality necessary to give rise to tortious interference with contract.  Specifically, Success contends that it would be reasonable for a factfinder to "infer that Nielsen either knew, or should have known, that the letter would call into question Success' survival as a small business, and therefore could reasonably lead the stores to believe that they were putting their own business in jeopardy by continuing to contract with Success."  (Def.'s Opp. at 19).  This precise argument has been rejected by courts that have addressed the issue.  See, e.g., Drummond v. Morgan Stanley & Co., No. 95 Civ. 2011 (DC), 1996 WL 631723, at *1 (S.D.N.Y. Oct. 31, 1996) ("[Defendant's] knowledge that plaintiff would be hurt is not sufficient to show that it acted maliciously or used fraudulent or illegal means or, indeed, that it deliberately intended to interfere with plaintiff's contract with [a third party].").

For these reasons, Nielsen's motion for summary judgment with respect to Success' tortious interference with contract claim is granted, and Success' cross-motion for summary judgment is denied.

55

b.       Tortious Interference With Prospective Economic Advantage

Success' tenth counterclaim alleges that Nielsen tortiously interfered with Success' prospective business relationship with the Original Pool stores (described in the Stipulated Injunction as "Nielsen Stores") by sending those stores a different letter, also purportedly in violation of the Stipulated Injunction, stating that "Success, as part of [this] lawsuit, has agreed . . . not to solicit you for a year . . . ." (Leclair Aff. Ex. 17; see Countercls. ¶¶ 310-17).  Both parties seek summary judgment in their favor with respect to this claim.

In New York, to state a claim for tortious interference with prospective economic advantage a plaintiff must establish: "[i] business relations with a third party; [ii] defendants' interference with those business relations; [iii] that defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and [iv] injury to the relationship."  Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417 (2d Cir. 2012) (citing Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)).  The third element of this sort of tortious interference claim "poses a 'particularly high hurdle, for it requires a plaintiff to show that the defendant committed a crime or an independent tort [such as fraud], or [acted] for the sole purpose of inflicting intentional harm' on the plaintiff."  Whitehurst v. 230 Fifth, Inc., 998 F. Supp. 2d 233, 247 (S.D.N.Y. 2014) (quoting Enzo Biochem, Inc. v. Molecular Probes, Inc., No. 03 Civ. 3816 (RJS), 2013 WL 6987615, at *3 (S.D.N.Y. Dec. 6, 2013)) (alterations in original).

56

According to Success, "[r]ecipients of the letter would undoubtedly interpret [it] . . . to imply that Success had committed some wrongdoing, and falsely mislead them to believe that Success was not permitted to solicit them for one year from the date of the letter." (Def.'s Mem. at 27-28).  The Stipulated Injunction actually only prohibited Success from soliciting each Original Pool store for one year from the date that the store had signed a contract with Success.  For this reason, Success asserts that these letters were sent with "malice aforethought" in an effort to pressure the Original Pool stores to avoid future business dealings with Success.  (Id. at 28).  Nielsen counters that it is entitled to summary judgment dismissing this claim because Success has not established that Nielsen's purported violation of the Stipulated Injunction – failing to disclose when the relevant one-year period began – satisfies the "wrongful means" element of a claim for tortious interference with prospective economic advantage.  (Pl.'s Mem. at 26-27).  Nielsen also contends that Success has failed to adduce any admissible evidence "that a prospective store decided to not pursue a business relationship with Success because of that language in the letter or based on any other conduct by Nielsen." (Id. at 27).  Nielsen is correct on both grounds.

Nielsen first contends that the omission of the start date for the stipulated one-year period cannot satisfy the wrongful means element of the claim because the omission did not constitute a crime, an act of malice, or extremely unfair economic pressure.  (Pl.'s Mem. at 26).  Success, not surprisingly, disagrees.  (Def.'s Opp. at 20-21).  Indeed, Success maintains that Nielsen's letter amounted to a "$7 billion

corporation's notice to individual convenience store owners" that they should cease

conducting business with Success.  (Id. at 21).  Particularly egregious in Success' view is

the letter's failure to identify the date on which the year-long bar on Success' solicitation

efforts was to commence.  (Def.'s Mem. at 27-28).

        While this omission may have created some confusion, it does not come

close to satisfying the wrongful means element of the claim.  As the New York Court of

Appeals observed in Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004), when a "suit is

based on interference with a nonbinding relationship, . . . as a general rule, the

defendant's conduct must amount to a crime or an independent tort," or there must be a

showing that the defendant acted "for the sole purpose of inflicting intentional harm on

[the] plaintiff[]."  Id. (quoting NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc., 628

N.Y.S.2d 408, 409 (3d Dep't. 1995)).  Here, the omission of the date when the one-year

period began clearly was not criminal.  Nor does it rise to the level of culpable conduct

necessary to constitute an act of malice or independent tort.  See id. at 190-92; Friedman

v. Coldwater Creek, Inc., 321 F. App'x 58, 59-60 (2d Cir. 2009) ("The New York Court

of Appeals has never held that any misrepresentation to a third party is sufficient to

sustain a claim for tortious interference with prospective economic relations.").  Indeed

Nielsen had a clear business reason to send the letter.  Moreover, to the extent that

Success contends that Nielsen's  actions constituted "extreme and unfair" economic

pressure, the letters – specifically the alleged misrepresentation concerning the date the

one-year clock was to begin running – in no way suggest that the requisite degree of

economic pressure was exerted on the third-party stores.  See Carvel, 3 N.Y.3d at 192 ("[T]he economic pressure that must be shown is not, as the [plaintiffs] assume, pressure on the [plaintiffs], but on the [third-parties].").

In any event, even if Success were able to establish the requisite level of wrongdoing, Success has failed to present any admissible evidence that any Original Pool store decided not to pursue a business relationship with Success based on the omission of further detail about when the one-year period would begin to run.  See Bankers Trust Co. v. Bernstein, 563 N.Y.S.2d 821, 822 (1st Dep't 1991) ("Interference with precontractual relations is actionable in New York when a contract would have been entered into but for the actions of the defendant.") (emphasis in original).  In fact, Tarlow conceded during his deposition,  that "[w]hen Nielsen sent out a letter saying that they were suing Success . . . it became reasonable at that time that a . . . sound businessman would not involve himself . . . [with] a company that may not be around in six months."  (Tarlow Dep. at 95-96).  Tarlow also testified that the Success Stores "did not want [to] take on or be involved in a messy matter with a five-and-a-half-billion-dollar corporation and a small company" and that "they decided not to move forward."  (Tarlow Dep. II at 186-87).  In light of these concessions, Success simply cannot show, as it must, that it was Nielsen's alleged misstatements in its letters, rather than the reality that there was litigation, that caused any of the Success Stores not to pursue a business relationship with Success.  See Snyder v. Sony Music Entm't, Inc., 684 N.Y.S.2d 235, 239 (1st Dep't 1999) ("but for" requirement of claim not met when business relationships in question

59

were placed in jeopardy by collateral events).  Accordingly, with respect to this counterclaim, Nielsen's motion for summary judgment is granted, and Success' cross-motion for summary judgment is denied.

In summary, both of Success' tortious interference claims fault Nielsen as much for sending the letters to the Original Pool and Success Stores as for the specific content of those letters.  The Stipulated Injunction, however, did not prohibit all communication between Nielsen and the Original Pool and Success Stores.  Therefore, the specific harm that Success alleges arose out of the letters is simply not relevant in determining whether summary judgment is appropriate.  For the same reason, Success' eleventh counterclaim alleging Nielsen's breach of a court cannot survive Nielsen's summary judgment motion.  (See Countercls. ¶¶ 318-22).

c.    Trade Defamation

Success' twelfth counterclaim alleges that Nielsen made "false, defamatory statements about Success and its business reputation" by suggesting to the recipients of the May 2011 letters that Success was at fault in the lawsuit that Nielsen had initiated against it and that they should "not  . . . have anything to do with Success."  (Countercls. ¶¶ 323-29).  Both parties seek summary judgment with respect to this claim.

Under New York law, "[t]he tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment."  Waste Distillation

Technology, Inc. v. Blasland & Bouck Engineers, P.C., 523 N.Y.S.2d 875, 877 (2d Dep't 1988). "The communication must play a material and substantial part in inducing others not to deal with the plaintiff, with the result that special damages, in the form of lost dealings, are incurred." Id.

  In its papers, Success has failed to identify a single false defamatory statement made by Nielsen to Success' detriment. For example, Success argues that the statement that "Nielsen has recently initiated litigation against Success," (LeClair Aff. Exs. 15-17), "disparage[d] Success" and harmed its business relationship with the stores receiving the letters, (Def.'s Opp. at 22). The problem with this argument is that the statement was absolutely true since Nielsen had, in fact, commenced this lawsuit. The remaining statements that Success seeks to characterize as false and defamatory already have been addressed in relation to Success' tortious interference claims. None of those statements are, in fact, express falsehoods, and, more importantly for purposes of this claim, they do not impugn Success or its business reputation in any way. Accordingly, while the May 2011 letters may have engendered some unnecessary confusion, they certainly were not defamatory. See Aero Media LLC v. World Healing Ctr. Church, Inc., No. 12 Civ. 5196 (LLS), 2013 WL 2896856, at *3 (S.D.N.Y. June 11, 2013) See In re Louis Frey Co., No. 03-15297 (SMB), 2006 WL 2090083, at *33 (Bankr. S.D.N.Y. July 28, 2006).

  Nielsen's motion for summary judgment dismissing this claim is therefore granted, and Success' cross-motion is denied.

61

5.      CUTPA

Success' fourteenth and final counterclaim alleges that Nielsen violated

CUTPA by engaging in "immoral unethical, illegal and unscrupulous" conduct during the

course of their business relationship, causing Success substantial harm.  (Countercls.

¶¶ 347-61; see Def.'s Mem. at 34).  Both parties seek summary judgment with respect to

this claim.  Success relies on the allegations that give rise to its remaining counterclaims

as the basis for its CUTPA claim.  (Def.'s Mem. at 34-35).  Both parties recognize,

however, that Success' CUTPA claim cannot withstand summary judgment if the only

other counterclaim that survives Nielsen's summary judgment motion is a breach of

contract claim.  (See Pl.'s Mem. at 30; Def.'s Opp. at 25); King's Choice Neckwear, Inc.

v. Pitney Bowes, Inc., 2009 WL 5033960, at *3-4 (S.D.N.Y. Dec. 23, 2009).  Inasmuch

as this is the outcome of the cross-motions, Success' CUTPA claim also cannot survive.

Therefore, Nielsen's motion with respect to this claim is granted, and Success' cross-

motion is denied.

6.      Abandoned Claims

Nielsen also has moved for summary judgment with respect to Success'

counterclaims in quasi-contract for unjust enrichment and quantum meruit.  (See Pl.'s

Mem. at 20-21; Countercls. ¶¶ 263-82).  Additionally, Nielsen has moved for summary

judgment dismissing Success' affirmative defenses of waiver and estoppel, unclean

hands, contributory negligence, accord and satisfaction, and its argument, framed as an

affirmative defense, that a third party caused Nielsen's damages.  (See Pl.'s Mem. at 30-

34).  Because Success did not address Nielsen's arguments in its opposition brief, the

Court deems these affirmative defenses and quasi-contract arguments abandoned.  See

Maxim Group LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 310 (S.D.N.Y.

Feb. 11, 2010); Taylor v. City of N.Y., 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal

courts may deem a claim abandoned when a party moves for summary judgment on one

ground and the party opposing summary judgment fails to address the argument in any

way.").

IV.    Proposed Connecticut Action

By letter dated June 27, 2014, Success sought Nielsen's consent to file a

complaint in Connecticut state court based on documents and information obtained during

discovery in this litigation pursuant to this Court's Protective Order.  (See ECF No. 156

(Aff. of Brian Moran, sworn to July 21, 2014 ("Moran Aff. III")), Ex. C; id. Ex. A ("Draft

Complaint"); ECF No. 33 ("Protective Order")).  The Draft Complaint alleges that

Nielsen and four of its employees – Robert Messemer, Julie Currie, Frank Piotrowski, and

Michael Elias – violated multiple Connecticut laws through their involvement in the

Sottile correspondence.  (Draft Complaint ¶¶ 2-6, 32-55).

Subsequently, on July 21, 2014, Success filed a motion to modify the

Protective Order to permit the filing of the Draft Complaint.  (ECF No. 158).  Nielsen, in

turn, opposed any modification of the Protective Order and, moved, pursuant to Federal

Rule of Civil Procedure 65, to enjoin Success from filing the Draft Complaint on the basis

that it asserts claims that constitute compulsory counterclaims in this action.  (ECF Nos. 154, 160).

      A.    <u>Preliminary Injunction</u>

Nielsen contends that Success should be enjoined from bringing any claims in Connecticut state court arising out of the Sottile correspondence because they should have been filed as compulsory counterclaims in this lawsuit pursuant to Rule 13(a) of the Federal Rules of Civil Procedure.  (See ECF No. 155 ("Pl.'s Prelim. Inj. Mem.") at 6-8).  Success responds that its proposed Connecticut claims against the individual Nielsen employees do not constitute compulsory counterclaims because they are not named as parties in the current action, and thus are not "opposing parties" for purposes of Rule 13(a).  (ECF No. 161 ("Def.'s Prelim. Inj. Opp.") at 10-14).[14]

Rule 13(a) requires that "[a] pleading . . . state as a counterclaim any claim that . . . the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."  Fed. R. Civ. Pro. 13(a).  A counterclaim arises out of the same transaction "when there is a 'logical relationship' between the counterclaim and the main claim."  <u>Jones v. Ford Motor Credit Co.</u>, 358 F.3d 205, 209 (2d Cir. 2004).  Success does not dispute that the Draft

---

[14]    Despite Success' assertion to the contrary, (<u>see</u> Def.'s Prelim. Inj. Opp. at 2-10), this Court has the authority to enjoin a litigant from filing an action in state court that has yet to be filed.  <u>See</u> <u>Dombrowski v. Pfister</u>, 380 U.S. 479, 485 (1965) ("[The Anti-Injunction Act] and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted."); <u>see also</u> <u>Bruce v. Martin</u>, 680 F. Supp. 616, 620 (S.D.N.Y. 1988) (enjoining the filing of a state court suit constituting a compulsory counterclaim in prior federal action).

Complaint alleges claims that arise out of the same transaction as Nielsen's claims in this action.  Accordingly, the key issue is whether Nielsen employees, sued in their personal capacity, are "opposing parties" within the meaning of Rule 13(a).

Courts that have considered who constitutes an "opposing party" under Rule 13(a) have struggled to reach a consensus as to the outer limits of that term. Specifically, the law is unclear as to whether the term "opposing parties" includes only the specific parties named in a lawsuit, or whether a more searching inquiry into the relationship among the parties is warranted to determine whether a seemingly distinct party is so "closely identified with a named party as to qualify as an 'opposing party.'" Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc., 292 F.3d 384, 390 (3d Cir. 2002).  The Second Circuit, however, has interpreted the term "opposing party" to encompass entities that are "one and the same for the purposes of  . . . litigation." Banco Nacional de Cuba v. First Nat'l City Bank of N.Y., 478 F.2d 191, 193 (2d Cir. 1973) (quoted in Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills, 701 F. Supp. 2d 568, 590 (S.D.N.Y. 2010)).  Nielsen's analysis, which suggests that this standard extends to the relationship between Nielsen and its employees, has some intuitive appeal, but the individual employees of a named corporate litigant are not opposing parties for purposes of Rule 13(a).

The cases cited in Mosdos, as well as other recent cases in this Circuit that have found unnamed parties to be one and the same as named parties, all address relationships with some independent legal significance.  See, e.g., Banco Nacional de

Cuba, 478 F.2d at 193 (parties the same for purposes of litigation because Banco

Nacional was the alter ego of the Republic of Cuba)); Peaktop Techs. (USA), Inc.

S'holder Derivative Litig. v. Peaktop Int'l Holdings Ltd., No. 06 Civ. 8228 (JSR), 2007

WL 700826, at *2–3 (S.D.N.Y. Mar. 6, 2007) (corporate defendant and wholly-owned

subsidiary same for purposes of litigation); Transamerica Occidental., 292 F.3d at 391

(parties in privity). Where, however, the parties are distinct entities, it is not sufficient

simply to be "closely related and act[ing] in concert for purposes of effectuating a

particular transaction."  See Sony Fin. Servs., LLC v. Multi Video Grp., Ltd., No. 03 Civ.

1730 (GWG), 2003 WL 22928602, at *4 (S.D.N.Y. Dec. 12, 2003), report and rec.

adopted, No. 03 Civ. 1730 (LAK), 2004 WL 194027 (S.D.N.Y. Feb. 2, 2004).

          Mosdos illustrates this dichotomy.  In Mosdos, Judge Karas considered

whether village employees, sued in both their individual and official capacities, should be

considered "one and the same" as the villages of which they were officials, where the

villages had been plaintiffs in a previous lawsuit.  Mosdos, 701 F. Supp. 2d at 588-92.

Judge Karas held that for purposes of a lawsuit brought against the individual defendants

in their official capacities, the individual defendants were "one and the same" as the

village, and thus were opposing parties against whom counterclaims had to have been

brought in the prior litigation.  Id. at 591.  Nielsen seizes on this aspect of Mosdos, urging

the Court to conclude that an employee sued for actions taken on behalf of her employer

necessarily constitutes the same party as the employer for purposes of Rule 13(a).  (Pl.'s

Prelim. Inj. Mem. at 7-8).  Nielsen's argument, however, ignores Judge Karas' reasoning,

which relied on the principle that federal claims against government employees sued in their official capacities are duplicative of claims against the governmental entities for whom they work.  Mosdos, 701 F. Supp. 2d at 591 (citing Kentucky v. Graham, 473 U.S. 159, 176 (1985)).  Here, by comparison, the prospective defendants are employees of a private company sued in their individual capacities.

Significantly, in Mosdos, Judge Karas concluded that the employees were not the functional equivalent of their employers, the villages, when sued in their individual capacities.  Id.  ("However, Defendants have asserted no argument, and the Court can think of none, supporting the proposition that the Individual Defendants, sued in their individual capacities, would be 'functionally equivalent' to or 'one and the same' as the [villages].");  see also DEF v. ABC, 366 F. App'x 250, 253 (2d Cir. Feb. 18, 2010) (a person does not constitute an opposing party for purposes of Rule 13(a) when serving in dual capacities).  Applying this reasoning, the Nielsen employees cannot be treated as their employer's alter ego for purposes of Rule 13(a).  Although this admittedly may spawn satellite ligation in certain circumstances, the term "opposing party" should not be stretched as Nielsen suggests, to include the employees of a party in every circumstance.  See Sony Fin. Servs., 2003 WL 22928602, at *4 ("[W]hatever flaws Rule 13 may have in limiting counterclaims to those against an "opposing party," the rule at least has the virtue of clearly informing parties of the situations when they must either bring a claim against such a party or be barred from asserting it in some other proceeding.").  Accordingly, Nielsen's motion for a preliminary injunction must be denied.

B.    <u>Modification of the Protective Order</u>

Having determined that Success may not be enjoined from proceeding against the Nielsen employees, the remaining question is whether Success may rely on information and documents obtained through discovery in this case to prosecute its planned Connecticut action.  (<u>See</u> ECF No. 159 ("Def.'s Modif. Mem.") at 4-8).

Rule 26(c) of the Federal Rules of Civil Procedure authorizes a federal court to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Fed. R. Civ. P. 26(c).  Such orders are subject to modification, and the decision "[w]hether to lift or modify a protective order is . . . committed to the sound discretion of the trial court."  <u>In re Agent Orange Prod. Liab. Litig.</u>, 821 F.2d 139, 147 (2d Cir. 1987).  When litigants have reasonably relied on a protective order, however, the court should not modify that order "absent a showing of improvidence in the grant of [the] order or some extraordinary circumstance or compelling need."  S.E.C. v. TheStreet.Com, 273 F.3d 222, 229 (2d Cir. 2001) (quoting Martindell v. Int'l Tel. & Tel. Corp., 594 F.2d 291, 296 (2d Cir. 1979)) (alteration in original).

Notwithstanding the "<u>Martindell</u> presumption" against modification of protective orders, the outcome in a particular case is "dependent upon [the] protective order's particular characteristics and whether it invites reasonable reliance on the

permanence of the order."  In re EPDM Antitrust Litigation, 255 F.R.D. 308, 318 (D.

Conn. 2009).  The factors to consider in determining whether a party reasonably relied on

a protective order include "[1] the scope of the protective order; [2] the language of the

order itself; [3] the level of inquiry the court undertook before granting the order; and [4]

the nature of reliance on the order."  Id.  The Court also may consider a party's purpose in

seeking modification of a protective order in reaching its decision.  Id.

   The first factor affecting whether Success' reliance on the Protective Order

was reasonable requires the Court to consider whether it is an "'umbrella' blanket-type

order, or a targeted protective order."  Int'l Equity Invs., Inc. v. Opportunity Equity

Partners Ltd., No. 05 Civ. 2745 (JGK) (RLE), 2010 WL 779314, at *4 (S.D.N.Y. Mar. 2,

2010), aff'd, 415 F. App'x 286 (2d Cir. 2011).  A broad protective order is less likely to

elicit reliance "because it is more difficult to show a party reasonably relied on a blanket

order in producing documents or submitting to a deposition."  EPDM, 255 F.R.D. at 319.

Here, the Protective Order is a broad blanket order, stipulated to by the parties, which

afforded the parties the discretion to designate whatever they produced as "confidential"

or "highly confidential."  (Protective Order §§ 2.1-2.3).  Moreover, like the

confidentiality order in International Equity Investments, the Protective Order is not

focused on a "narrow set of materials" and allowed for the unilateral designation of

materials without judicial involvement.  Int'l Equity Investments, 2010 WL 779314, at

*5.  This factor thus favors Success.

Next, the Court must consider whether the Protective Order "contains express language that limits the time period for enforcement, anticipates the potential for modification, or contains specific procedures for disclosing confidential materials to non-parties." Id.  Prior to signing the parties' stipulated Protective Order, I added a provision (as is my custom) stating that "[t]his Protective Order does not bind the Court, which retains the right to modify it at any time." (Protective Order § 17).  The parties also recognized that designations pursuant to the Protective Order could be challenged.  (Id. § 9).  On the other hand, Section 15 of the Protective Order requires that within forty-five days of the termination of this action, the "original and all copies of every document and thing" designated as confidential or highly confidential be destroyed.  (Id. § 15).  These provisions suggest that the parties could not necessarily assume that the Protective Order would remain unmodified during the life of this lawsuit, but could reasonably expect that any information produced subject to the Protective Order would ordinarily not be used in other matters.  This factor thus favors Nielsen to the extent that Success seeks to use the protected information for purposes beyond the present litigation.

The final two factors to assess with respect to the issue of reasonable reliance are the level of inquiry made by the Court prior to granting the Protective Order and the nature of the parties' reliance on the Protective Order.  Int'l Equity Investments, 2010 WL 779314, at *6-8.  Both weaken Nielsen's claim of reasonable reliance.  First, the Court "so ordered" the Protective Order without holding a hearing or reviewing any of the materials that would be subject to the Protective Order.  This diminishes the degree of

reliance the parties could place on the Protective Order not being modified because the Court was not involved in either drafting its language or designating materials pursuant to it. Additionally, the materials produced subject to the Protective Order were the types of materials that the parties would have been obligated to produce in discovery, even in the absence of a protective order. Cf. EPDM, 255 F.R.D. at 322 ("Where a party or deponent, in reliance on the protective order, gives up its right to refuse to testify, or to produce documents it would not otherwise be compelled to produce, the heightened Martindell presumption against modification naturally applies.").

In sum, although the parties reasonably relied on the fact that the Protective Order would not be modified during the course of this litigation, their reliance "was not so overwhelming as to warrant the indefinite application of Martindell's strong presumption against modification." Int'l Equity Invs., 2010 WL 779314, at *8. Specifically, the broad scope of the Protective Order, combined with the Court's limited involvement and the nature of the parties' reliance outweighs their expectation, if any, that the Protective Order would not be modified during the course of this litigation. Nevertheless, the parties were justified in believing that the Protective Order would not be modified for purposes external to this lawsuit. (See Protective Order § 15).

Here, Success has failed to make out a "good faith, legitimate challenge" to the Protective Order. See Int'l Equity Invs., 2010 WL 779314, at *8. Although the claims in the Draft Complaint may not technically constitute compulsory counterclaims, Success had every opportunity to use the materials it obtained in the course of discovery

71

in this action to litigate any claims arising out of the Sottile correspondence before this

Court.  Accordingly, Success may not now attempt to take a second bite at the proverbial

apple by using materials produced in this matter, with the reasonable belief that they

would only be used for this matter, to litigate further in Connecticut state court.

V.    Conclusion

        For the foregoing reasons, Nielsen's motion for summary judgment (ECF

No. 123) is granted in part and denied in part and Success' motion for summary judgment

(ECF No. 126) is granted in part and denied in part.  Further, Nielsen's motion for a

preliminary injunction (ECF No. 154) and Success' motion for modification of the

Protective Order (ECF No. 158) are denied.  A telephone conference shall be held on

August 31, 2015, at 2 p.m.  Plaintiff's counsel shall initiate that call.  Trial shall

commence on December 1, 2015, at 10 a.m., in Courtroom 20A.

        SO ORDERED.

Dated:      New York, New York
            August 18, 2015

                                    _____
                                           FRANK MAAS
                                    United States Magistrate Judge

Copies to All Counsel via ECF

72